**Application of Hugh RODMAN and Hugh Rodman, Jr.**

**Patent Appeal No. 6101.**

United States Court of Customs and Patent Appeals.

May 25, 1955.

Rehearing Denied July 1, 1955.

Green, McCallister & Miller, Pittsburgh, Pa. (Melville E. Jones, Washington, D. C., of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges.

COLE, Judge.

The sole issue presented here is whether the Board of Appeals of the United States Patent Office erred in holding certain material limitations appearing in claims 45 to 48 inclusive of appellants' application for a patent for improving "Quenching Oils" to be without requisite basis in the specification disclosure. No prior art is therefore involved.

The appealed claims define an oil blend composition used as a coolant or "quenching" agent in a bath where red-hot steel, heated above its critical temperature, is immersed so that it can be rapidly cooled and thereby hardened to withstand wear and abrasion. While the use of various oils and oil blends for the stated purpose is a known expedient, appellants state that the characterizing feature of their disclosure is the production of oil blends in which the base oil of the blend is a mineral oil having a viscosity substantially lower than the viscosity of any base oil previously employed in producing such oil blends. Appellants urge that their quenching oil composition satisfies a long recognized need for a cooling medium producing exceptional results in greatly increased capacity for hardening steel.

Preliminary to setting forth claims representative of those on appeal, and discussing the subject matter comprehended thereby, this brief explanation of certain terminology employed in the quenching oil art will be helpful.

It is known that the degree of hardness obtained through use of oil as a quenching medium is largely determined by the "initial quenching speed" thereof. This term, or IQS as it is referred to in the appealed claims, may be defined as being a calorimetric determination of the percentage of available heat removed from a test piece of steel at 1500° F. when it is immersed for five seconds in the quenching agent at 100° F. In other words, the term has reference to the amount of heat removed from steel during the first five seconds of the quenching process. There is also a ten second quenching speed test which is identical to the test for determining the IQS of the coolant, except that the quenching time interval is ten seconds instead of five. Each of these tests thus indicates the effectiveness of the quenching medium in cooling (and simultaneously hardening) the steel under treatment. The five second speed (IQS) of the coolant is a factor of the utmost importance as it is during this initial period of the quenching operation that principal hardness is imparted to the steel. Many efforts have been made to increase the IQS of oils used as quenching agents, and IQS-increasing additives for this purpose are in common usage.

It further appears that the particular viscosity rating of a given oil or oil blend is a material consideration affecting its value as a cooling medium. The viscosity of a fluid may be defined in terms of its consistency at 100° F. measured in seconds by a viscosimeter. More specifically, a test for measuring viscosities of liquids is to ascertain the period, measured in seconds, of liquid flow through a submerged orifice of definite size while the liquid exists at a defined temperature, such as 100° F.

Appellants assert that there are vast differences between the heat absorbing characteristics of low and high viscosity base oils. The principal constituent of appellants' blend is a low viscosity base oil. Small amounts of additives in varied proportions are mixed with the base oil to increase the IQS of the blended com-

position. The preferred embodiment of appellants' oil blend to effect the results claimed is set forth in their application as consisting of a mineral base oil of viscosity about 38 to 45, blended with about 5% of an additive, the final blend having a viscosity between about 40 and 50 seconds, and an IQS of 30 to 35.

As aforesaid, the question for decision is whether there is adequate disclosure in appellants' specification to support the claims as drawn. More particularly, the issue is confined to whether a viscosity range for the blended oil of from about 38 to about 55 seconds is in conformity with ranges in the application as filed and, secondly, whether there is support in the specification for an IQS-increasing additive (*per se* old in the art) in amount sufficient to produce an IQS (initial quenching speed) in excess of 22% for the blended oil.

Appealed claims 45 and 48 respectively illustrate the relationship of each of the limitations in question to the subject matter of the claim. It is to be noted in the claims that the abbreviation "SUS" (Saybolt Universal Seconds) is a term having the same significance as viscosity, the terms for our purposes herein being interchangeably employed. The representative claims read:

"45. A quenching oil blend for use in hardening steel, having an IQS within the range of from about 30 to about 40, a 10 Second Speed in excess of 53 and a viscosity within the range of from about 38 to about 55 SUS at 100° F, at least 85% of which consists of a mineral base oil having a viscosity within the range of from about 34 to about 50 SUS at 100° F with the remainder consisting substantially entirely of an IQS-increasing additive.

"48. A quenching oil blend for hardening steel having an IQS above 22 and a 10 Second Speed above 53, and consisting of a mineral base oil having a viscosity between 34 and 50 SUS at 100° F blended with an IQS-increasing ad-

ditive in an amount sufficient to produce an IQS in excess of 22."

As to the first limitation in issue, i.e., the viscosity range of about 38 to about 55 for the blended oil, the Board of Appeals clearly stated its position with regard thereto as follows:

"Considering first the preferred embodiment of the invention, it is quite clear that it fails to teach this range since the final blends of this embodiment have viscosities ranging from 40 to 50 SUS at 100° F.

"As regards the data set forth in the Table on page 14 of the specification, we agree with the appellants that it appears from these data that where viscosity of the base oil is 41.5 SUS at 100° F. the viscosities of the blends will vary from 42.5 to as high as 52 SUS, depending on the amount of IQS-increasing additive employed and that the best results are obtained by viscosities of the blends ranging from 43.2 to 47.2 SUS. However, we fail to see how these data teach the specific range of viscosities which the Examiner held to be without basis in the present specification.

"As regards the showing in the graph [of the specification] that a slight increase in viscosity over a viscosity of 37.2 of the base oil occasions a substantial increase in the hardening effect of the blend, we are at a total loss to understand how this disclosure per se or in combination with the preferred embodiments of the invention and the data presented on page 14 of the specification teach the range in question."

Appellants' brief on appeal does not with any real degree of particularity point out specific error in the board's conclusions. The arguments advanced therein do not go to the essence of the controversy, but are instead framed in generalities which do not readily lend themselves to interpretation of purpose. We believe, however, that the rejection was entirely proper for reasons we now

give in supplementation of those of the board.

Appellants' base oil as defined in the appealed claims has a viscosity range of 34 to 50 SUS. When blended with an IQS-increasing additive, the viscosity of the composition likewise increases. For example, the table in appellants' specification indicates that when a base oil of 41.5 viscosity is blended with 1% to 15% additive, the viscosity increases gradually from 42 for 1% up to 52 for 15%. Thus, in appellants' view, when base oils of varying viscosities within the claimed range of 34 to 50 SUS are blended with additives of certain percentages the range of 38 to 55 SUS for the blended oil was deemed logical and hence claimed. Specifically, with respect to the upper limit of 55 SUS, appellants assert that when a base oil of viscosity of 50 SUS is blended with an additive in certain proportion the viscosity of the final blend will necessarily be in the neighborhood of 55 SUS.

■■ We find no statement in the application wherein appellants make specific reference to setting the lower viscosity range at about 38 SUS and the upper at about 55 SUS for the blended oil. On the other hand, the preferred embodiment of the alleged invention, as disclosed in the application, clearly shows final blends having viscosities ranging from 40 to 50 SUS, the viscosity of the base oil being from 38 to 45 SUS. By reference to tables and drawings supplementing the word description of the specification it is observed that maximum hardness in the steel is developed when the viscosity of the base oil is about 39 to 42 SUS with 5% additive. Although appellants, in drawing claims, are not to be restricted to their preferred embodiment, it is well settled that the claim is the measure of invention, and that the material part of that invention, as defined by such claim, must be adequately disclosed in the specification. Certainly, the range in question must be considered a material part of the claimed invention and, as such, there must be a clear and reasonable basis or founda-

tion in the application to support it. Manifestly, this is lacking in a specification requiring resort to a process of mental gymnastics in an effort to possibly ascertain that which should be abundantly evident therein. Accordingly, we find the range of about 38 SUS to about 55 SUS for the blended oil, which is included in claims 45, 46, and 47, to be without basis in the appellants' specification.

The remaining limitation, included in claims 46 and 48, is drawn to an IQS-increasing additive in amount sufficient to produce an IQS in excess of 22% for the blended oil. Support for this limitation is allegedly found in appellants' specification wherein it is taught that optimum results are obtained when the IQS of the blended oil is within the range of from 21 to 39%. The board held that while there was basis in the specification for the range of 30 to 40% IQS, as set forth in representative claim 45, previously quoted, there was no basis for an IQS in excess of 22% for the reason "that an applicant may not arbitrarily introduce limits of ranges into the specification." This holding was apparently predicated on the board's finding that the figure 22 does not specifically appear in the specification.

Appellants contend that a blend having an IQS within the range of 30 to 40% includes an IQS in excess of 22%, and that the board therefore erred in failing to find adequate basis for the latter limitation after ruling that appellants were entitled to claim a range of 30 to 40% IQS.

It appears that appellants, in their preferred embodiment, use an additive capable of increasing the IQS of the blend to 30 to 35%. This disclosure, coupled with the aforementioned specific showing of IQS's ranging between 21 to 39%, was sufficient in the board's view to support a range of 30 to 40 IQS. It does not follow, however, that an IQS in excess of 22% is adequately disclosed. In this regard, we think the following excerpt from the brief of the Solicitor for the Patent Office correctly demon-

strates the weakness in appellants' position:

" * * * By reference to the table on page 14 of the record, it would appear, as pointed out by the board, that it would have been logical to have picked 21 as the lower limit, particularly since the attainment of a hardness of above 280 Brinell was considered an accomplishment. It is needless to say that the figure 22 appears nowhere in the specification and appellants have advanced no single reason why that number was selected instead of any other number less than 30. Since the claim is the measure of the invention, the limitations therein should have some relation or materiality to the described invention; otherwise the statutory mandate for clarity and exactness (35 U.S.C. 112) is negated. * * * "

For the reasons hereinbefore stated, the decision of the Board of Appeals is affirmed.

Affirmed.