**ACME TIRE AND BATTERY COMPANY, Inc., Appellant,**

v.

**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee.**

**No. 20641.**

United States Court of Appeals
Fifth Circuit.

April 9, 1964.

J. Danforth Browne, of Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., William Terrell Hodges, Tampa, Fla., for appellant.

Bessie Margolin, Associate Sol. Dept. of Labor, Washington, D. C., Charles Donahue, Sol. of Labor, Beate Bloch, Warren M. Laddon, Attys., U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., for appellee.

Before TUTTLE, Chief Judge, and PHILLIPS* and JONES, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Acme Tire and Battery Company, Inc., hereinafter referred to as Acme, was engaged in the business of selling tires and batteries and recapping tires. From February 5, 1960, to September 15, 1961, Acme employed Frank Mathis as a recapper at its recapping shop in Tampa, Florida, and paid him $69 per week without regard to the specific hours worked per week or per day and without additional compensation for hours worked in excess of 40 per week. The Secretary of Labor, pursuant to a written request from Mathis, filed the instant action against Acme to recover unpaid minimum wages and overtime compensation alleged to be due to Mathis under the provisions of the Fair Labor Standards Act of 1938 (29 U.S.C.A. § 201, et seq.), hereinafter referred to as the Act.

* Of the Tenth Circuit, sitting by designation.

Acme defended on the ground, among others, that its operations were exempt from coverage as a retail or service establishment under § 13(a) (2) and § 13 (a) (4) of the Act. Trial was had to the court and the court concluded that Acme failed to sustain its burden of proving that it was exempt from coverage as a retail or service establishment. Judgment for the Secretary in the amount of $794 was entered and Acme has appealed.

The record on appeal, which embraces only the pleadings, answers of Acme to certain interrogatories and requests for admissions, and the findings of fact and conclusions of law of the trial court, discloses the following facts respecting Acme's operations:

At all times here material, Acme's main place of business was an L-shaped building in Tampa, Florida. One leg of such building housed a central office and a retail outlet, and the other leg housed a recapping shop and warehouse. The two legs of the building were separated by a wall. Acme also maintained two warehouses located elsewhere in Tampa and owned the stock of four separate corporations, each of which operated a retail tire store under the name of Acme Retail Store Corporation, hereinafter referred to collectively as Acme Stores.

All of the merchandise sold at Acme Stores was purchased by Acme, received by it at its main place of business, and then delivered to Acme Stores out of Acme's general stock. Acme Stores were billed the amount which Acme paid the manufacturer. Recapped tires were delivered to Acme Stores by Acme and were billed to them at Acme's cost.

Acme performed the crediting, billing, accounting, preparation of profit and loss statements and other bookkeeping functions for Acme Stores at its main place of business. Acme maintained a separate account for each of the Acme Stores and billed each of such accounts upon delivery of merchandise.

Each of the Acme Stores had a bank account. Acme was authorized to make and did make withdrawals from the bank account of each of such Stores in order to pay indebtedness due from it to Acme for merchandise.

One of the Acme Stores had no recapping facilities of its own and all of the recapped tires sold by it were obtained from Acme. A minimum of 80 per cent of the recapped tires sold by such store was obtained from general stock maintained by Acme at its main place of business. Such tires were not earmarked to be returned to any particular customer's vehicle. The remainder of such recapped tire sales was of tires earmarked to be returned to the vehicles of the customers who brought them in for recapping.

The other three Acme Stores had their own tire recapping equipment and only approximately 10 per cent of the recapped tires sold by them were obtained from Acme. Approximately 50 per cent of the recapped tires sold by such three stores and by Acme at its main place of business were from general stock. The remainder were earmarked to be returned to the vehicles of the customers who brought them in for recapping.

Acme and Acme Stores regularly encouraged customers to exchange their used tires for recapped tires, rather than await the recapping of their own tires, and Acme maintained a stockpile of recapped tires for such sales in its warehouse.

The total volume of sales from Acme's main place of business from February 5, 1960, to September 15, 1961, was $1,-214,647.43; the total volume of sales, billings, or transfers from Acme's main place of business to Acme Stores for such period was $387,243.82; the total volume of sales of tires recapped by Acme at its main place of business for such period was $235,023.66; and the total volume of sales of tires recapped by Acme at its main place of business, which were sold, transferred or transported to Acme Stores for such period was $83,143.53.

In the tire recapping industry a central office, warehouse, or processing establishment, which serves a chain of re-

tail stores is not recognized as a retail establishment.[1] The tire industry recognizes three classifications of sales: wholesale, commercial, and retail. Approximately 40 per cent of Acme's total sales were commercial sales. Commercial sales are more like retail sales than wholesale sales. However, the evidence failed to establish their exact nature.

Facts were stipulated showing that Acme employed Mathis in "commerce," as defined in the Act, from February 5, 1960, to September 15, 1961.

The Act provides in pertinent part as follows:

"§ 206. Minimum wages; * * *

"(a) Every employer shall pay to each of his employees * * * wages at the following rates—

"(1) not less than $1 an hour; [2]

\* \* \* \* \*

"§ 207. Maximum hours

"(a) Except as otherwise provided in this section, no employer shall employ any of his employees * * * for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

\* \* \* \* \*

"§ 213. Exemptions

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * * or (4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsection and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: *Provided*, That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located; * * *."

In Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed. 2d 393, the Supreme Court in discussing the exemption provisions of the Act said:

"We have held that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit. The three conditions of § 13(a) (2) are explicit prerequisites to exemption, not merely suggested guidelines for judicial determination of the employer's status."

The burden of proving the existence of the three conditions of § 13(a) (2) of the Act is upon the employer [3] and we agree with the trial court that Acme did not sustain that burden as to

1. That fact was shown by uncontroverted evidence.

2. The minimum wage was raised to $1.15 an hour effective September 3, 1961. (75 Stat. 67)

3. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 393, 80 S.Ct. 453, 4 L.Ed.2d 393; Mitchell v. Kentucky Finance Co., 359 U.S. 290, 291, 79 S.Ct. 756, 3 L.Ed.2d 815; Walling v. General Industries Co., 330 U.S. 545, 547, 548, 67 S.Ct. 883, 91 L.Ed. 1088; Goldberg v. Warren G. Kleban Engineering Corporation, 5 Cir., 303 F.2d 855, 859; Gatlin v. Mitchell, 5 Cir., 287 F.2d 76, 78; Mitchell v. Hunt, 5 Cir., 263 F.2d 913, 916; Foremost Dairies v. Ivey, 5 Cir., 204 F.2d 186, 188.

the existence of two of those conditions, namely, that 75 per cent of its annual dollar volume of sales is not for resale and that 75 per cent of its annual dollar volume of sales is recognized as retail sales in the tire industry.

Approximately 40 per cent of Acme's total volume of sales was derived from "commercial sales" and Acme wholly failed to establish the nature of such commercial sales; that they were not for resale; or that they were recognized in the industry as retail sales. Hence, Acme failed to prove that 75 per cent of its sales were not for resale or were recognized in the industry as retail sales.

Moreover, the only evidence as to the dollar volume of sales from Acme's main place of business covers a 19-month period, rather than an "annual" period, as required by the Act. There is no evidence from which Acme's annual dollar volume of sales can be determined.

Furthermore, the total dollar volume of sales for such 19-month period was $1,214,647.43. During the same 19-month period the dollar volume of sales, billings, or transfers to Acme Stores was $387,243.82. The latter transactions, being admittedly for resale, constitute approximately 31 per cent of the total dollar volume of sales from Acme's main place of business. Thus, it is apparent that during such 19-month period more than 25 per cent of Acme's total dollar volume of sales was for resale.

Acme contends that the $1,214,647.23 figure does not include the $387,243.32 of sales, billings, or transfers to Acme Stores; that by including such transactions the total dollar volume of sales for the 19-month period is actually $1,601,890.55; and that, therefore, the sales, billings, or transfers for resale to Acme Stores constitute only 24 per cent of the total dollar volume of Acme's sales during the 19-month period. But Acme failed to prove the facts upon which its argument is based. The evidence is that the total volume of sales during the 19-month period was $1,214,647.43, and not that the total volume of such sales, excluding transactions with Acme Stores, was $1,214,647.43, as Acme argues.

 We conclude that Acme failed to prove that its operations were those of a retail establishment and within the exemption from the coverage of the Act.

Since Acme failed to establish the basic requirements of § 13(a)(2) of the Act, to qualify for exemption as a retail establishment, it is unnecessary to determine whether it meets the additional requirements of § 13(a)(4).

The judgment is affirmed.