W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellee,

v.

KEYSTONE READERS SERVICE, INC.,
and Gary Waechter, d/b/a Ben Franklin
Reading Club, Defendants-Appellants.

No. 26556.

United States Court of Appeals
Fifth Circuit.

Nov. 14, 1969.

Alan Douglas Greene, Alan A. Bruckner, Bruckner & Greene, Miami, Fla., for defendants-appellants.

Charles Donahue, Solicitor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, James H. Woodson, Regional Attys., U. S. Dept. of Labor, Atlanta, Ga., Bessie Margolin, Robert E. Nagle, Joel Chasnoff, Attys., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

A man engaged in the stream of peddling magazine subscriptions seeks absolution for his failure to observe the requirements of federal wage and hour legislation. We deny absolution.

This action was brought under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., to enjoin Gary Waechter, an individual doing business as the Ben Franklin Reading Club, from violating the minimum wage, overtime, record keeping, and child labor provisions of the Act. There is no dispute that Waechter's personnel are "employees" within the meaning of the Act, or that Waechter's business is within the Act's general coverage. There is also no objection raised on appeal to the injunction of the trial court insofar as it relates to the child labor or applicable record keeping requirements. The only issues are whether Waechter can claim the "retail establishment" exemption of § 13(a) (2) [1] and whether he can claim the "outside salesman" exemption of 13(a) (1).[2] The trial court found that Waechter was not entitled to the claimed exemptions and that he had violated the Act as alleged by the Secretary. An injunction issued accordingly, and this appeal followed.

Waechter has been doing business as the Ben Franklin Reading Club since

---

1. 29 U.S.C.A. § 213(a) (2):

The provisions of sections 206 and 207 of this title shall not apply with respect to—any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 203(s) (4) of this title), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title or such establishment has an annual dollar volume of sales which is less than $250,-000 (exclusive of excise taxes at the retail level which are separately stated). A "retail or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * *.

2. 29 U.S.C.A. § 213(a) (1):

The provisions of sections 206 and 207 of this title shall not apply with respect to—any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulation of the Secretary, subject to the provisions of the Administrative Procedure Act, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); * * *.

January 16, 1964. He maintains an office in North Miami Beach, Florida, and for a time during 1965 and 1966 maintained an additional office in Miami. Waechter is engaged in selling magazine subscriptions on an installment basis and in processing, collecting, and servicing such subscription sales. His operations have been conducted pursuant to a local franchise agreement with Keystone Readers Service, Inc., a Philadelphia, Pennsylvania, subscription agency, and a wholly owned subsidiary of Curtis Publishing Company.[3] According to this agreement, Waechter is authorized to solicit magazine subscriptions in the state of Florida, and to forward such orders to Keystone. On July 1, 1966, Keystone assigned its rights under the agreement to John L. Glover of Atlanta, Georgia, who operates under a regional franchise agreement with Keystone.

Waechter obtains orders for magazine subscriptions primarily through door-to-door solicitation. This solicitation is performed in three stages—by "student salesmen," student managers, and verifiers, respectively. The "student salesmen" are boys of high school and college age—some as young as 13—who are hired to make the first contact on a house-to-house canvass. They report daily to one of appellant's offices for briefing and for transportation to their respective routes.

At each home on his route the "student salesman" delivers a prepared talk, memorized from material provided by Waechter. He attempts to induce the householder to agree to subscribe to some of the magazines listed on a card supplied by Waechter. The prospect is told that he can receive four magazine subscriptions for a total price of 41 cents per week. If the prospect agrees to subscribe, the "student salesman" then asks him to sign an Order Card, which includes the following wording:

"Please enter my order for magazines listed above. I am to receive all magazines by mail. AT A TOTAL COST OF 41 CENTS PER WEEK, PAYABLE MONTHLY, FOR 60 MONTHS."

The "student salesmen" are instructed to ascertain, during the encounter with each prospect, whether the prospect meets certain qualifications established by Waechter. They are prohibited from collecting money, and are instructed not to discuss any method of payment with the potential customer. Should a prospect inquire about the method of payment, or the matter of pricing, the "student salesmen" are instructed merely to state that payments are due monthly and that someone else will obtain the customer's signature and collect the money.

When completed, a signed Order Card is taken by the "student salesman" to a student manager. The student manager subsequently contacts the same prospect, and, with the Order Card in hand, reviews the magazines selected. After confirming that the prospect meets Waechter's qualifications, the student manager explains Waechter's accelerated "pay as you read plan." This plan—which contains terms different from those represented by the "student salesman" and from those listed on the Order Card—provides for payment at $3.50 per month, payable in 30 months. If these terms are acceptable to the customer, he executes a Contract Form and makes the first payment to the student manager. The Contract Form also contains the following provision:

"This contract is subject to acceptance by the Company and the Publish-

3. The government has informed the court that "Keystone was initially made a party defendant in this action, but was dismissed pursuant to a stipulation between Keystone and the Secretary. Under the terms of this stipulation, Keystone agreed to insert clauses requiring compliance with the Fair Labor Standards Act in all future franchise agreements, and to attempt to amend all current franchise agreements by the insertion of similar clauses."

er. NO VERBAL ARRANGEMENTS RECOGNIZED."

It is worthy of note that the Contract Form always replaces the Order Form as the final agreement, and Waechter will not accept a subscription order on the terms contained in the Order Card even if the customer so requests.

After a signed Contract Form is obtained by a student manager, the student manager returns to Waechter's office, where the contract is checked over by office personnel called verifiers. These verifiers make sure that the magazines selected fall within certain allowable groupings and that the Contract Form has been properly completed. In addition, a telephone verification is made to determine whether the customer understands the terms of the Contract Form agreement. Once verification has occurred, Waechter compensates the student managers, and they in turn compensate the "student salesmen" who work under them. Waechter then prepares a ledger sheet containing a list of magazines requested, publishers' names and addresses, and the down payment made by each customer. This information is forwarded to Glover in Atlanta. Waechter also regularly sends to Glover monies collected on previous subscription orders, and reports on such collections.

After Glover records the information on new orders, these orders are sent on to Keystone in Philadelphia, where they are processed by computer to determine whether the magazines ordered are authorized, whether the correct number has been specified, whether the magazines are properly priced, and whether any deficiencies exist in the order. If all of the proper conditions are not specified in the order, Keystone returns it to Waechter, who must then obtain the customer's approval for making the necessary changes. From Keystone, the processed orders are transmitted to the various publishers. The magazines are mailed directly from the publisher to the customer.

On these facts the district court concluded that the "student salesmen" could not qualify as "outside salesmen" within the meaning of § 13(a) (1) because they were not engaged in making sales of their own, but in doing promotional work for sales to be made by others, i. e., the student managers. The court found that such promotional work was not exempted under the authority of the applicable department Bulletin. 29 C.F.R. § 541.504(a).

The court also found that the Ben Franklin Reading Club was not an exempt "retail or service establishment" within the meaning of § 13(a) (1). Although the Club's annual gross receipts were less than $250,000.00, as required by the statute, the court found the exemption inapplicable because (a) more than 50 per cent of Waechter's annual dollar volume of sales are made outside the state of Florida, and (b) no concept of retail sales or servicing exists in the magazine industry.[4]

Waechter appeals from these determinations by the court below. We affirm. We find no substance to appellant's claim that the "student salesmen" are outside salesmen within the meaning of § 13(a) (1). We also agree with the district court's determination that appel-

---

4. With respect to the absence of a retail concept in the magazine industry, the court found as follows:

"Defendant's sales are not recognized as retail sales in the particular industry, for there is no concept of retail selling or servicing in the magazine industry. [Citing Idaho Sheet Metal Works v. Wirtz, 1966, 383 U.S. 190, 86 S.Ct. 737, 745, 15 L.Ed.2d 694]. In so holding, the Court deems these 'student salesmen' for magazine subscription services to be analogous to newspaper boys and there is no concept of retail selling or servicing in the newspaper industry. [Citing Idaho Sheet Metal Works v. Wirtz, supra; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 79 S.Ct. 756, 759, 3 L.Ed.2d 815]. Where Congress intended that this type of business have an exemption, one is specifically provided by the law. See, for example, 29 U.S.C. § 213(d)." 282 F.Supp. 871, 875 (S.D.Fla.1968).

lant is not entitled to the retail establishment exemption of § 13(a) (2). On this point, however, we do not rely, as did the district court, on the absence of a retail concept in the magazine industry, a finding on which we express no opinion.[5] Instead, we base our decision on the narrower ground that appellant does not maintain in his business the kind of "establishment" which Congress exempted under the Act.

## I.

■ We direct our attention first to the "retail establishment" exemption of § 13(a) (2). In its present form § 13(a) (2) reads in pertinent part as follows:

"The provisions of sections 206 [minimum wage] and 207 [maximum hours] of this title shall not apply with respect to * * * any employee employed by any retail or service *establishment* * * * if more than 50 per cent of such *establishment's* annual dollar volume of sales of goods or services is made within the State in which the *establishment* is located, and such *establishment* is not in an enterprise described in section 203(s) of this title or such *establishment* has an annual dollar volume of sales which is less than $250,000. * * * A 'retail or service *establishment'* shall mean an *establishment* 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *. [Emphasis added.]

As the statute itself indicates, the retail establishment exemption of § 13(a) (2) applies only to "establishments," and not to businesses in their entirety. Thus the pertinent inquiry is not whether the business enterprise as a whole is engaged in retailing, but whether the particular *establishment* under scrutiny is engaged in retailing. A. H. Phillips, Inc., v. Walling, 1945, 324 U.S. 490, 496, 65 S.Ct. 807, 89 L.Ed. 1095, 1100.[6]

5. While we find it unnecessary in the present case to reach the question of whether the magazine industry contains a retail concept, we do note that the record on this issue was improperly developed by the Secretary. The legislative history of the Act contains no express mention of the magazine industry as such, but only of the newspaper industry. See Idaho Sheet Metal Works v. Wirtz, 1966, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694. The differences between the two industries might be insignificant for purposes of the retail establishment exemption; however, in the present case the Secretary introduced no evidence on this point. It seems to us that in the future it would behoove the Secretary to demonstrate this fact by expert testimony and not to rely on the bare assertion of an analogy between the two industries. This is particularly true in a situation, such as the case before us, where his opponent introduces numerous expert witnesses to the contrary. *Cf.* Telephone Answering Service v. Goldberg, 1 Cir. 1961, 290 F.2d 529, 534, discussing Mahoney v. Mahoney, E.D.Tenn.1960, 186 F.Supp. 636. Courts are not equipped to make an interpretative application of a complex regulatory statute in a factual vacuum. We are loathe to sanction decisions by evidentiary default in areas affecting the public interest.

6. See Lewis v. Brandt Furniture, Inc., W.D.La.1967, 277 F.Supp. 907, 912, aff'd, 5 Cir. 1968, 402 F.2d 265:

"To better understand the weight to be given the 'distinct physical place of business' test used in *Phillips*, it must be remembered that prior to that decision some courts had decided that an 'establishment' might be as complex as an employer's business activity, and that there might be several retail outlets and wholesale warehouses within a single 'establishment.' In short, 'establishment' was equated with 'business,' and so long as the entire business of an employer met the percentage requirements of Section 13(a) (2), that business in its entirety was viewed as a single exempt retail establishment. Walling v. Block, 139 F.2d 268 (9 Cir. 1943); Walling v. L. Wiemann Co., 138 F.2d 602, 150 A.L.R. 878 (7 Cir. 1943); White v. Jacobs Pharmacy Co., 47 F.Supp. 298 (N.D.Ga.1942); Duncan v. Montgomery Ward & Co., 42 F.Supp. 879 (S.D.Tex.1941); Veazey Drug Co. v. Fleming, 42 F.Supp. 689 (W. D.Okl.1941); 150 A.L.R. 884. The Supreme Court, in *Phillips*, made it clear

In the case before us there is a substantial question as to the existence of a retail "establishment" in appellant's business. In this regard we note that our case is somewhat unique. In every other case that has been brought to our attention, the existence of a retail "establishment" somewhere in the business enterprise was an accepted fact; the issues litigated involved such matters as the status of a warehouse or central accounting office that was serving well recognized retail outlets, A. H. Phillips, Inc. v. Walling, *supra*; Brewers, Inc. v. Wirtz, 5 Cir. 1967, 375 F.2d 911; Mitchell v. Kroger Co., 8 Cir. 1957, 248 F.2d 935; Mitchell v. E. G. Shinner and Company, 7 Cir. 1955, 221 F.2d 260; Bogash v. Baltimore Cigarette Service, 4 Cir. 1951, 193 F.2d 291; Walling v. Goldblatt Bros., 7 Cir. 1946, 152 F.2d 475, cert. denied, 328 U.S. 854, 66 S.Ct. 1344, 90 L.Ed. 1627; McComb v. Wyandotte Furniture Co., 8 Cir. 1944, 169 F.2d 766; Mitchell v. Better Living Market, Inc., S.D.Miss.1960, 195 F. Supp. 403; Lewis v. Brandt Furniture, Inc., W.D.La.1967, 277 F.Supp. 907, aff'd, 5 Cir. 1968, 402 F.2d 265; Wessling v. Carroll Gas Co., N.D.Iowa 1967, 266 F.Supp. 795, or the character of defendant's establishment as either wholesale or retail, Idaho Sheet Metal Works v. Wirtz, 1966, 383 U.S. 190, 86 S.Ct. 737; Wirtz v. Broward Marine, Inc., 5 Cir. 1968, 390 F.2d 788; Rachal v. Allen, 5 Cir. 1967, 376 F.2d 999; Telephone Answering Service, Inc. v. Goldberg, 1 Cir. 1961, 290 F.2d 529; Wirtz v. Office Communications Co., M.D.N.C., 244 F.Supp. 994. In the present case we are not immediately concerned with the wholesale or retail character of appellant's business or the status of any commercial component such as a warehouse or a central ac-

counting office which is said to be an adjunct to a recognized retail outlet. Here we are faced with an even more fundamental question: Assuming *arguendo* that appellant sells at retail, does he in fact maintain an *establishment* that sells at retail?

█ We do not hesitate to say that appellant's salesmen do not themselves qualify, either individually or collectively, as an "establishment" within the meaning of the exemption. This follows from the Supreme Court's definition of an "establishment" as "a distinct physical place of business." A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095, 1100. In the same opinion the Court instructed us that "Congress used the word 'establishment' as it is normally used in business and in government." *Id.* An establishment must have some *locus*; it cannot exist as merely a chimera or a concept. Nomadic solicitors in search of customers do not by their wanderings establish any corporeality. While salesmen may *inhabit* establishments, in normal parlance they certainly do not *constitute* them.

Since appellant's salesmen are not themselves retail establishments, appellant's only possible "retail establishment" is his business office in North Miami Beach. If this office does not qualify as a retail establishment, then appellant maintains no retail establishment at all and cannot qualify for the § 13(a) (2) exemption.

In determining whether appellant's office in North Miami Beach can qualify as an exempt retail establishment, we begin by noting that central accounting offices in retail chain store operations have been consistently denied the retail establishment exemption. A. H. Phil-

that an establishment was a distinct place of business and not a grouping of places of business, and that in applying the retail exemption each place of business must be considered separately."

See also 95 Cong.Rec. 12579 (1949) (remarks of Sen. George) :

"I wish to say that the word 'establishment' has been very well defined in the Wage and Hour Act. It means now a single physically separate place of business which possesses the characteristics of a retailer and it does not mean an entire business enterprise."

lips, Inc. v. *Walling, supra;* Mitchell v. Kroger Co., *supra;* Mitchell v. E. G. Shinner and Company, *supra;* Mitchell v. Better Living Market, Inc., *supra.* A close reading of these cases indicates that they are significant both for what they directly hold and for what they implicitly assume. Implicit in these cases is the assumption that under normal circumstances a central accounting office does not by itself constitute a retail establishment. Thus, in Mitchell v. E. G. Shinner and Company, 7 Cir. 1955, 221 F.2d 260, 261, the court noted:

> "All of the employees at the central office are engaged in the general operation of defendant's 33 retail meat markets, including the purchase of merchandise, accounting, clerical duties, maintenance of payroll records and related duties. *No selling is done at the central office, nor is it open to the general consuming public."* [Emphasis added.]

We note that this assumption concerning central accounting offices is so deeply ingrained in the reported cases that the contrary has seldom if ever been asserted. Employers seeking to have the retail establishment exemption applied to their clerical employees have almost always taken the position that the accounting office is an *adjunct* to a retail outlet and that the office and the retail outlet *together* constitute a single retail establishment. A. H. Phillips, Inc. v. *Walling, supra;* Mitchell v. Kroger Co., *supra; cf.* Mitchell v. Birkett, 8 Cir. 1961, 286 F.2d 474; Lewis v. Brandt Furniture, Inc., *supra;* Wessling v. Carroll Gas Co., *supra.* Clearly if an accounting office standing alone could be a retail establishment, no necessity would exist for resorting to the more sophisticated "adjunct" argument.

■ This is not to say, of course, that an accounting office standing alone can *never* be a retail establishment. Exceptional cases can be found, such as Mitchell v. T. F. Taylor Fertilizer Works, 5 Cir. 1956, 223 F.2d 284, in which an accounting office was allowed the retail

establishment exemption because it was open to the general consuming public and actually serviced retail customers in much the same way as a local store. Sales were made at the business office (as well as by salesmen on the road), and goods were delivered directly to the consumer from the company's own fertilizer plant. Cases such as *Taylor Fertilizer,* however, must be considered distinct departures from the norm. They simply indicate that where substantial sales activity is conducted at a business office, the office may, despite subordinate clerical activity, constitute a bona fide retail outlet servicing the consuming public.

In this connection it should be noted that the Secretary has acknowledged by Interpretative Bulletin that a place of business must be *open and available* to the general consuming public before it can qualify as a retail establishment: " * * * an establishment, wherever located, will not be considered a retail or service establishment within the meaning of the Act, if it is not ordinarily available to the general consuming public." The same Bulletin goes on to say that an establishment

> "does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public. A refrigerator repair service shop, for example, is available and open to the public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." 29 C.F.R. § 779.319.

Putting together the requirement of availability and the disclaimer of actual visitations, we read the Secretary's Bulletin as establishing a standard of *consumer access* as the test for the kind of establishment which will receive the retail exemption, provided it meets the other requirements of § 13(a) (2). Not only is it necessary that the establish-

ment have access to the public, *the public must also have access to the establishment*. In other words, it must be a two-way street. We must have either a physical or electronic confrontation or communication between buyer and seller before we can say there is access by the customer to the selling establishment. Only if such access exists is an establishment truly open and available to the general consuming public within the meaning of the Secretary's Bulletin.

■ The Secretary's interpretation, of course, is not binding on the courts, but it is entitled to careful consideration and in proper circumstances to considerable weight. See Wessling v. Carroll Gas Company, N.D.Iowa 1967, 266 F.Supp. 795, 799. In Skidmore v. Swift & Co., 1944, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129, the Supreme Court said of Interpretative Bulletins of the Wage and Hour Administrator (now the Secretary):

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

■ In our view 29 C.F.R. § 779.319 is consistent with prior court decisions and with the purposes and aims of the Fair Labor Standards Act. See Mitchell v. E. G. Shinner and Company, *supra;* Fleming v. A. B. Kirschbaum Co., 3 Cir. 1941, 124 F.2d 567, 572, aff'd, Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; 95 Cong.Rec. 12579 (1949). As such it is entitled to recognition and application in the case before us. While its precise contours have as yet to be established by further court decisions, we have no difficulty in saying that on the record before us appellant has failed to sustain his burden of showing that his sole place of business (the North Miami Beach office) falls within the retail establishment exemption. Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815; Wirtz v. Office Communications Co., M.D.N.C.1965, 244 F.Supp. 994, 999.

■ It is undisputed that appellant's North Miami Beach office is engaged primarily in the work of order verification. Employees in this central office examine the contracts brought in by the student managers to ascertain whether the available magazines have been properly selected by the purchasers and to determine whether the contracts have been properly completed and the necessary information supplied. The contract data are then transferred to ledger sheets which are forwarded to Glover and Keystone. With the possible addition of payroll computations and the collection of monies on outstanding installment contracts, this apparently is the essence of office procedure. It is thus undisputed that the functions of the North Miami Beach office are entirely clerical in nature. No sales are made at the office itself, nor does the office hold itself out to the general consuming public as a place where magazines may be purchased. Of significance also is the fact that the North Miami Beach office is not equipped to make magazine sales. With the exception of a few samples, it stocks no magazines, displays no magazines, and delivers no magazines. There is likewise no evidence that any full-time sales personnel are retained at the office, nor do consumers look to the office as a potential source of magazine supply. As presently constituted, appellant's office is merely a place in which to process customer orders. It thus plays only a subordinate role in the essential day-to-day contact with the consumer. In all

of these respects it is totally unlike the corner newsstand, despite the fact that both purport to retail the same commodity.

■ It is worthy of note that appellant at trial summoned various experts to testify that his business is an example of "non-store retailing." According to appellant's experts, non-store retailing includes the telephone-to-consumer and door-to-door sales approach characterized by the Fuller Brush man, the Avon cosmetics representative, and the Electrolux vacuum cleaner salesman. These are said to involve "essentially door-to-door sales where the consumer does not enter into anything that looks like a store. The contact is made in his home." Appellant's business is said to fall within this house-to-house retailing category. Based on such evidence, appellant argues in effect that he can qualify for the § 13(a) (2) exemption because he is engaged in *retailing*.

As we read the Act, however, appellant's contention is based upon a misapprehension of the retail establishment exemption. The exemption does not apply to all *retailers*; it applies to retail *establishments*. A fixed retail establishment is an essential prerequisite to the application of § 13(a) (2). Assuming that appellant's experts have fairly characterized his business, his brand of retailing does not take place in any fixed establishment. His retailing activities occur solely in the consumer's home, and a prospective customer's home obviously cannot constitute the seller's retail establishment.

■ This is not to say, of course, that if a retail or service establishment is open and available to the consuming public and itself equipped to carry out retailing functions, it runs the risk of endangering its status as a "retail establishment" simply by hiring outside salesmen or repairmen. The Secretary's own example of a refrigerator repair shop (29 C.F.R. § 779.319) indicates this is not so. But at the same time an estab-

lishment that is essentially an accounting office cannot *vicariously* acquire the character of a retail establishment by having outside salesmen in its employ. Outside salesmen, after all, are exempt under an entirely separate provision of the Act. 29 U.S.C.A. § 213(a) (1); see Mitchell v. T. F. Taylor Fertilizer Works, 5 Cir. 1956, 233 F.2d 284, 286–287. Given this fact, it would make little sense to permit the existence of outside salesmen to dictate the character of the establishment and thereby to place the clerical employees who work there outside the embrace of the Act. To do so would reverse the natural order of things and permit the tail to wag the dog.

The proper order of events requires that we look first to the character of the establishment. See 29 C.F.R. § 779.302. If it is not an establishment "the principal activity of which is to furnish service [or goods] to the consuming public," Fleming v. A. B. Kirschbaum Co., 3 Cir. 1941, 124 F.2d 567, 572, aff'd, Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, then the exemption must be denied. In our view the principal activity of appellant's North Miami Beach office does not include service to the consuming public.

Functionally considered, appellant's office deals primarily with the franchisers of the Ben Franklin Reading Club. It thus bears little resemblance to the typical retail establishments enumerated in the legislative history of the Fair Labor Standards Act. The retail establishment exemption was meant for such establishments as grocery stores, drug stores, hardware stores, and clothing shops, all of which are open and available to the general public. Fleming v. A. B. Kirschbaum Co., 124 F.2d at 572–573. In the case of service establishments, the exemption was designed for "barber shops, beauty parlors, shoe-shining parlors, clothes pressing clubs, laundries, automobile repair shops." Wood v. Central Sand & Gravel Company, W.D.Tenn. 1940, 33 F.Supp. 40, 47. This list is by no means exclusive, but the examples

are apt.[7] None resembles appellant's office where nothing but clerical functions are performed. Since the office is not functionally a part of any retail outlet which might be called a distinct physical place of business, we are constrained to hold that the Ben Franklin Reading Club contains no retail establishment within the meaning of § 13(a) (2).

In so deciding, we are mindful of the narrow construction which must be given to the retail establishment exemption in light of the remedial purposes of the Act. As the Supreme Court said in A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 1098–1099:

> "The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

Accord, Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393, 396; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815, 819; Acme Tire and Battery Co. v. Wirtz, 5 Cir. 1964, 330 F.2d 116, 118.

We think that the district court was correct in holding that the retail establishment exemption is inapplicable to appellant's business. Since we sustain this conclusion on the ground that appellant does not maintain the kind of "establishment" required by the Act, we find it unnecessary to consider appellant's other claims of error arising out of § 13(a) (2), including the volume of appellant's intrastate sales, whether appellant's sales are recognized as retail within the industry, and the effect, if any, of certain opinion letters which appellant received from the Department of Labor.

### II.

Appellant also presents a claim under the "outside salesman" exemption of § 13(a) (1). Since the absence of an "establishment" is not dispositive of this issue, it must be separately considered.

Section 13(a) (1) provides an exemption from the wage and hour provisions of the Act with respect to

7. We note that the Secretary, in 29 C.F.R. § 779.320, has included the following types of establishments in his "partial list of establishments whose sales or service may be recognized as retail": antique shops, auto courts, automobile dealers' establishments, automobile laundries, automobile repair shops, barber shops, beauty shops, bicycle shops, billiard parlors, book stores, bowling alleys, butcher shops, cafeterias, cemeteries, china, glassware stores, cigar stores, clothing stores, coal yards, confectionery stores, crematories, dance halls, delicatessen stores, department stores, drapery stores, dress-suit rental establishments, drug stores, dry goods stores, embalming establishments, farm implement dealers, filling stations, floor covering stores, florists, funeral homes, fur repair and storage shops, fur shops, furniture stores, gift, novelty and souvenir shops, grocery stores, hardware stores, hosiery shops, hotels, household appliance stores, household furniture storage and moving establishments, household refrigerator service and repair shops, infants' wear shops, jewelry stores, liquor stores, luggage stores, lumber yards, masseur establishments, millinery shops, musical instrument stores and repair shops, newsstands, paint stores, public parking lots, photographic supply and camera shops, piano tuning establishments, public baths, public garages, radio and television stores and repair shops, recreational camps, reducing establishments, restaurants, roadside diners, scalp-treatment establishments, shoe repair shops, shoeshine parlors, sporting goods stores, stationery stores, taxidermists, theatres, tourist houses, trailer camps, undertakers, valet shops, variety shops, watch, clock and jewelry repair establishments.

"any employee * * * employed in a bona fide executive * * * capacity * * * or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary * *)."

Pursuant to this express grant of authority, the Secretary has defined the term "outside salesman," in 29 C.F.R. § 541.500, as follows:

"The term 'employee employed * * * in the capacity of outside salesman' in section 13(a) (1) of the act shall mean any employee:

(a) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:

(1) Making sales within the meaning of section 3(k) of the act; or

(2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer * * *."

* * * * * *

This regulation, adopted pursuant to an express delegation of authority by Congress, becomes in effect a part of the statute and has the force and effect of law. Helliwell v. Haberman, 2 Cir. 1944, 140 F.2d 833, 834; Walling v. Yeakley, 10 Cir. 1944, 140 F.2d 830.

Appellant does not challenge the validity of the Secretary's regulation, but contends only that it was improperly applied to the facts of this case. He argues that the "student salesmen," even if not making sales within the meaning of the regulation, were at the very least "obtaining orders" or procuring "commitments" as the latter term is used in the Secretary's Interpretative Bulletin. 29 C.F.R. § 541.504.

Appellant further contends that the "student salesmen" participated in a joint sale with the student managers and that therefore the former are exempt. For this argument he relies on the Secretary's broad definition of participation in a sale, which appears at 29 C.F.R. § 779.241.

The argument that the "student salesmen" obtained orders or commitments as defined by the regulation (29 C.F.R. § 541.500) and the Interpretative Bulletin (29 C.F.R. § 541.504) must be rejected for the reasons given by the trial court. The court found that the "student salesmen" were not exempted by § 13(a) (1) because the Interpretative Bulletin makes clear that "promotional work which is incidental to sales made, or to be made, *by someone else,* is not exempt work." (Emphasis added.) 282 F.Supp. at 875. In the words of the Secretary's Bulletin: "To the extent that they are engaged in promotional activities designed to stimulate sales which will be made by someone else the work must be considered nonexempt." 29 C.F.R. § 541.504(a) (2).

The district court concluded that the "student salesmen" were engaged in promotional activities incidental to sales made by the student managers: "In effect," said the court, "the 'student salesmen' are engaged only in obtaining a list of persons who seem receptive to the idea of purchasing magazine subscriptions—they pave the way for the student managers to subsequently take orders." 282 F.Supp. at 875.

In our view the district court's characterization of the work done by the "student salesmen" is supported by the evidence and is not clearly erroneous. We cannot accept appellant's claim that the follow-up work of the student managers was only for the purpose of verifying a sale already made or an order already secured. If the "student salesmen" actually made "sales" or secured "orders," why were the orders they secured (the Order Cards) always replaced by the final contract (the Contract Form) and never communicated to the company? The evidence shows that the Order Cards secured by the "student salesmen" were turned over only to the student managers and therefore had no *independent significance* for the company apart from their obvious function as leads or comeons. Under these circumstances we cannot say there was error in the trial

court's determination that the "student salesmen" performed promotional work that merely served to "pave the way for the student managers to subsequently take orders." It seems to us that the "student salesmen" were nothing more than pseudo-salesmen, and as such not within the coverage of an exemption that must be narrowly construed. See Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393, 396; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815, 819; A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095, 1098–1099; Acme Tire and Battery Co. v. Wirtz, 5 Cir. 1964, 330 F.2d 116, 118.

 Our view in this matter is not affected by the broad definition of participation in a sale which appears in 29 C.F.R. § 779.241. This Interpretative Bulletin provides in part:

> "As long as an employee in any way participates in the sale of the goods he will be considered to be 'selling' the goods, whether he physically handles them or not. Thus, if the employee performs any work that, in a practical sense is an essential part of consummating the 'sale' of the particular goods, he will be considered to be 'selling' the goods."

Relying on this Bulletin, appellant claims that the "student salesmen" participated in sales because their activities were essential in a practical sense to the sales that were ultimately made.

Appellant's argument in this regard must be rejected. In the first place, the Interpretative Bulletin relied upon by appellant (29 C.F.R. § 779.241) pertains to the enterprise *coverage* of the Act,[8] not to the outside salesman *exemption*. Given the rule that coverage provisions are to be liberally construed while exemptions are to be narrowly construed, definitions for one purpose would seem ill suited to the other. Moreover, were we to give the term "sales" the expansive interpretation contended for by appellant, even promotional activities in aid of another's sales would qualify an employee for the outside salesmen exemption. This would not only contradict the Interpretative Bulletin which most directly bears upon § 13(a) (1), i. e., 29 C.F.R. § 541.-504, but also it would create an irreconcilable conflict between two of the Secretary's Bulletins. Under these circumstances, the more sensible result requires that the definition of "selling" contained in 29 C.F.R. § 779.241 be limited to matters concerning enterprise coverage under § 3(s) [9] of the Act. To hold otherwise would be to engraft upon the § 13(a) (1) exemption an interpretation which almost certainly was intended to apply only to the Act's *coverage*.

Applying the dual mandates of broad coverage and narrow exemptions, we find the Ben Franklin Reading Club beyond the pale of either the retail establishment or the outside salesman exemption.

The judgment of the district court is

Affirmed.

---

8. A close reading of 29 C.F.R. § 779.241 indicates that the broad definition of "selling" contained therein has reference to the terms of § 3(s) of the Act, 29 U.S.C.A. § 203(s). This section, which is clearly a *coverage* provision of the Act, defines a covered "enterprise" as one having, inter alia, "employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person." It seems evident from the scope of these terms that Congress had reference to any employee who had anything to do with goods which moved in commerce. Thus it is not surprising that the Secretary has interpreted the terms "handling," "selling," and "working on" in a broad fashion, particularly in view of the well settled principle that the coverage provisions of the Act are to be liberally construed.

9. 29 U.S.C.A. § 203(s). See footnote 8, *supra*.