**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**CAMPUS CHEFS, INC., a corporation, Defendant.**

**No. 1842.**

United States District Court
N. D. Georgia,
Rome Division.

Nov. 1, 1968.

---

Beverley R. Worrell, Regional Atty., United States Dept. of Labor, Atlanta, Ga., for plaintiff.

Alexander E. Wilson, Jr., Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., District Judge.

This is an action brought by the Secretary of Labor to enjoin the defendant from violating the minimum wage, overtime, and recordkeeping provisions of the Fair Labor Standards Act. While stipulating that it has employees engaged in commerce or in the production of goods for commerce and that the annual gross volume of sales of defendant enterprise is not less than $1,000,000, the defendant denies that it is subject to the provisions of the Act.

(1) In this connection, it contends it is exempt from both minimum wage and overtime provisions by virtue of 29 U.S. C.A. § 213(a) (2), which provides an exemption with respect to:

"[A]ny employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment * * (ii) is in such an enterprise and is a hotel, motel, *restaurant,* or motion picture theater; * * *.

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is *not for resale* and *is recog-*

*nized as retail sales,* in the particular industry;" (Emphasis supplied) [1] and by virtue of 29 U.S.C.A. § 213(a) (20), which provides such an exemption with respect to:

"[A]ny employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs." [1]

(2) Defendant further contends that it is exempt from the current overtime provisions by virtue of 29 U.S.C.A. § 213(b) (8) which provides an exemption therefrom with respect to:

"any employee employed by an establishment which is a hotel, motel, or restaurant," [2] and

by virtue of 29 U.S.C.A. § 213(b) (18) which provides an exemption therefrom with respect to:

"Any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs." [2]

The case was extensively tried non-jury on which the court makes the following

## FINDINGS OF FACT

The defendant Campus Chefs, Inc. is a closely held corporation involved in various aspects of food service. As early as 1953, it embarked on the contract operation of dining halls and cafeterias for educational and other public institutions. It now has some 25 such operations up and down the eastern seaboard including the one at Shorter College, Rome, Georgia.

Shorter is an independent church oriented college, composed of day students and some 350 boarding students. Prior to 1963, it operated its own dining facilities, including the purchasing, preparation, and serving of all meals to its faculty and students. In keeping with a growing trend, on December 21, 1962, it entered into a contract with Campus Chefs, Inc. to take over the operation of its two eating facilities—one in the main campus dining hall and one in the Hotel Graystone, used as a boarding facility for male students, in downtown Rome.

While some such operations serve food to students on a direct cash payment basis, the contractual arrangement entered into (Def. Ex. #1) here is typical of those in existence at some 40% of the nation's colleges and universities, as well as industrial plants, hospitals, and various government installations. At Shorter College the defendant purchases food from sources in the local area, it prepares the food, and it serves the food cafeteria-style directly to students, faculty and staff at contract prices. During the regular school year, defendant bills the school $8.75 (now $9.60) each for the maximum weekly enrollment of boarding students during the regular school year (excluding Christmas and Spring Holiday weeks) for a maximum period of thirty-four weeks. Day students, guests, and others paying cash to defendant at the time meals are purchased are charged set prices for breakfast, lunch and dinner. A "casual sale"

1. This is the Act of May 5, 1961. The complete exemption was abolished by the 1966 Act.

2. This is the Act of October 15, 1966. As can be seen the complete exemption of § 213(a)(20) in the 1961 Act has been retained as an overtime exemption in § 213 (b)(18) of the 1966 Act. Thus the case involves the retrospective application of the exemptions as to both minimum wage and overtime provisions and the prospective application of the exemptions as to overtime provisions only from the effective date of the new Act on February 1, 1967.

is made to any non-contract person who presents himself in the cafeteria seeking service. In certain instances these "casual" meals and special groups such as visiting athletic teams, alumni meetings, etc. are billed by defendant back to Shorter. All of the employees in the establishment are the employees of the defendant, and it maintains its own office on campus at Shorter. As seen, defendant selects the menus, and purchases, prepares and serves the food, but in all but a few isolated instances is paid by a weekly billing to Shorter on the agreed rates. (Pl. Ex. #5). Bulk food is delivered, stored and prepared in each location, and there is no central warehouse or preparation center. The entire risk of profit or loss on said operation rests on defendant, and it pays the sales tax to the state.[3]

On the other hand, the college has no control over the food or food service, except that it has the right to require the defendant to provide wholesome and nutritious food with a reasonable variety. In addition, it furnishes space, utensils, equipment and utilities necessary for the operation of the food service and maintains the premises in good repair and provides certain janitorial services. Its business manager oversees the performance of the contract and makes periodic checks of the food service, arranges for special events, transmits complaints to defendant's local manager, approves and pays the weekly billing, and, in general, coordinates the responsibilities of the two parties under the contract. Shorter's motivation in entering into the agreement was to insure proper service at a cheaper rate to its students as well as being relieved of the management problems connected with food service.

The funds for payment are received by Shorter in the form of board charges to each student. For several years this was a specified charge of $450.00 per year, with a separate room charge of $250.00 per year. Presently, there is a combined room and board charge of $750.00 per year. All of such funds are retained by the college and there are no rebates to the student for meals not taken. As can be seen, there is a slight excess in cash received by Shorter and cash paid out to defendant on the contract. It is clear, however, that there was no profit motivation on Shorter's part in entering into the contract.

An exhaustive cost analysis of Shorter's operating budget by CPA specialists in the hospital, hotel, motel and restaurant field reveals there is no actual profit to Shorter in the operation. (Def. Ex. #2). In this analysis, four different accounting calculations were used, resulting in an insignificant variance of 16¢ "profit" to 25¢ "loss" per student per week. The best method and the one adopted by the Court as reasonable and fair is the so-called "step-down" procedure of cost allocation. Such procedure is that recommended for accounting purposes by the American Council on Education to its member colleges and universities and is likewise recommended by the Department of Health, Education and Welfare for costs computation in its "Medicare" program. Such an adaptation to Shorter's accounts reveal an actual loss to the college from the contract with defendant.

The defendant is a long-time member of the National Restaurant Association and Georgia Restaurant Association. Its members are basically restricted to the "retail" end of the food service industry as opposed to the "wholesale" function. Its prime qualifications for membership is the sale and service of food to the ultimate consumers, i. e., "the hungry person." Its roll includes in addition to traditional restaurants, drive-in, carryout, cafeteria, institutional, in-plant, and food contract members. It excludes all food processors, wholesalers and jobbers

---

3. If the sale of food is from defendant to Shorter College, it would be exempt under the State Sales Tax Regulations as "Food purchased by the college or university and furnished to its students as a part of a single charge for room, board, and tuition." Sec. 560–12–2.123.

from its rolls. Within the association and the industry, defendant is considered as a retail restaurant operation.

The Bureau of the Budget's Standard Industrial Classification also classifies food service contractors such as the defendant as "retailers."

Likewise from an academic marketing point of view where the dominant criteria are the motives of the parties, the defendant is considered as the "seller", the student as the "buyer" with Shorter as an agent of the buyer. (Def. Ex. #3 and 4). In marketing theory, the method of payment is considered insignificant to the basic functions of the parties.

At least 50% of the establishment's sales are made within the state of Georgia and, at least, 75% of its sales are made via the "board contract" method described.

The employees of defendant were paid at less than the minimum wage for straight and overtime during the period in question.

### CONCLUSIONS OF LAW

■■ The primary burden to show coverage is upon the Secretary and this was established. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Thereupon, the burden of proving any exemption was cast upon the employer. In this connection, the courts have uniformly held that the retail exemptions are to be narrowly construed against employers seeking to assert them and the exemption must be limited to those establishments plainly and unmistakenly within their "terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). *E. g.,* Wirtz v. Edisto Farms Dairy, 242 F. Supp. 1 (D.S.C.1965).

In order to establish the claimed retail exemption, it is necessary for the defendant to prove (1) that 50 per cent of the establishment's annual dollar volume of sales is made within the state (stipulated here), (2) that 75 per cent of the annual dollar volume of sales is not for resale and (3) that 75 per cent of the annual sales volume is recognized as retail in the industry. Goldberg v. Furman Beauty Supply, Inc., 300 F.2d 16 (3rd Cir. 1962).

Based on the above, the Secretary contends that defendant's sales are in fact for resale by virtue of the board contract arrangement with Shorter College. It is likewise insisted that a lack of access to defendant's establishment by the general public negates its standing as a retail restaurant. Finally, it is contended that the operations do not amount to a separate business "establishment" so as to qualify for any exemption.

■ No issue was made as to defendant's status as an "establishment" at trial. To the contrary, recognition of such fact was inherent in the stipulation "that 50 per cent of the establishment's annual dollar volume of sales is made within the state." In any event, the distinction is important only when there is a mixture of non-retail and retail operations. Here the defendant's operations, whatever they are, are for purposes of this suit of the same type. "The word 'establishment' [must be used] as it is normally used in business and in government." A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). In such a sense there is no doubt that the defendant's food service is an establishment. It is "functionally distinct". Mitchell v. Gammill, 245 F.2d 207 (5th Cir. 1957). Nor does the fact that it is carried on in Shorter's building destroy its characteristic as a distinct physical place of business. For an establishment to be functionally distinct, it is not necessary that it be physically separate. To rule otherwise would be to require any independent business operating on the premises of another to be categorized with the business operations of the landlord, lessor, or licensor. There is nothing to indicate any such intention on the part of Congress.

To the contrary, the conference committee at the time stated in its report:

"The location of the establishment, whether in an industrial plant, an office building, a railroad depot, or a Government park, etc. will make no difference in the application of the exemption. So long as the establishment meets the tests (described above), it will be excluded from the minimum wage and overtime provisions of the Act."

The contention that defendant's business does not constitute such an establishment is rejected here.

Any consideration of the exemptions claimed must begin with the case of McComb v. Factory Stores, 81 F.Supp. 403 (N.D.Ohio 1948). Factory Stores was an independent contractor providing a general catering service for the employees of Republic Steel by operating canteens and restaurants inside Republic Steel's plants. Factory Stores had a written contract with Republic Steel relating to the prices and quality of the food service Factory Stores was to provide. These provisions were frequently discussed by Republic Steel and its employees' bargaining representatives.

The only payments discussed in the case were indirect payments to Factory Stores, which flowed from Republic Steel's employees through Republic Steel to Factory Stores. Factory Stores provided "coupon trade books" to Republic Steel's employees for their canteen purchases. Employees who worked overtime were given meal chits by Republic to purchase meals from Factory Stores, and Factory Stores turned the chits over to Republic Steel for payment. When Republic employees did not have time to go to the canteens to purchase food, Foremen appointed Republic employees as canteen boys to take food orders from their fellow employees. Then the canteen boys purchased food to fill a number of orders and the transaction was recorded as a single sale by Factory Stores. The boys then delivered the food to purchasers in boxes Republic made for this purpose.

There were a number of different establishments described in the Factory Stores case, and in some cases the restaurant facilities were owned by Factory Stores and in some cases they were not. In many instances, the public was denied admittance by guards posted at the gates. The Court denied the "retail or service establishment" exemption to Factory Stores, and subsequently Congress amended the "retail or service establishment" exemption and added an exemption for food service establishments. Both Houses of Congress then filed reports to accompany the 1949 Amendments to the Fair Labor Standards Act, and these reports indicated that the exemption was to apply to independently owned and operated food service establishments such as those which were involved in the *Factory Stores* case, regardless of whether they were located in industrial plants or in colleges.

The 1949 amendments to the Act creating the retail exemptions were patently designed to eliminate from coverage the employees of such establishments. 2 United States Code Congressional and Administrative News, pp. 2252–53, 2264 (81st Cong., 1st Sess., 1949); 29 CFR § 779.389ff., .318ff (1968); 95 Cong.Rec. 114111. Such amendments caused a remand of the *Factory Stores* case. 6 Cir., 179 F.2d 238.

Moreover, the House Manager's report which accompanied the 1961 amendments involved here stated:

"Clauses (2) and (20) of Section 12(a) also are intended to continue the exemption for independently owned and operated restaurants in industrial plants, office buildings, government installations, hospitals, and colleges, such as were operated in McComb v. Factory Stores, 81 F.Supp. 403 (1948)." House Report No. 75, 87th Congress, 1st Sess., March 13, 1961.

See also 29 CFR § 779.389.

The foundation for investigation, therefore, is the clear Congressional intent to exclude the *Factory Stores* type of operation from coverage along with

the more conventional types of restaurants and cafeterias.

In such an inquiry, the interpretations placed on the exemptions by regulation, while not binding on the court, are entitled to consideration as useful guidelines in examining the problem. Acme Car & Truck Rentals, Inc. v. Hooper, 331 F.2d 442 (5th Cir. 1964). On such basis, the central attributes of "retail" and "restaurant" appear here.

Thus, the defendant "serves the everyday needs of the community in which it is located" and "performs a function in the business organization of the nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process." 29 CFR § 779.318. It is a "cafeteria" normally recognized as retail. 29 CFR § 779.320. Based upon "the well-settled habits of business, traditional understanding and common knowledge," it is retail. 29 CFR § 779.323. Its "sales are numerous and involve small quantities of goods and services," are received by the "general consuming public" and easily distinguishable from a wholesale food operation. 29 CFR § 779.327. Nor is the disposition of its products for the purpose of "selling again" nor as "parts or ingredients of other goods" nor as "raw materials." 29 CFR §§ 779.330, .331, .332. It likewise appears that the transaction is one involving goods or services that are frequently required for family use. Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 203, 86 S.Ct. 737, 15 L.Ed.2d 694 (1965).

For 13(a) (2) and 13(a) (20) purposes, it is "primarily engaged in selling—prepared food and beverages for immediate consumption on the premises." 29 CFR § 779.390. And its employees are employed "primarily in connection with the preparation or offering of food or beverages for human consumption— on the premises." 29 CFR § 779.391.

Thus, not only within the industry, but from a practical, statutory, or regulatory view, it is apparent that defendant meets the tests of "retail" and "restaurant" *unless* such status is destroyed by (1) the failure of the general public to frequent the establishment or (2) the mode of payment. The court concludes that neither factor changes the result.

(1) Generally speaking, "where a sale is recognized as retail—, its character as such will not be affected by the character of the customer." 29 CFR § 779.328. Thus, the fact that the vast majority of defendant's customers are in a particular category as "food contract" purchasers is not the controlling inquiry. A like situation existed in *Factory Stores*. Only recently, the court was faced with a cafeteria operation for NASA where obviously the customers were limited to NASA employees and approved visitors at the White Sands Proving Ground. Here, as there, the defendant imposed no restrictions upon whom it would serve and, in fact, serves many "casuals". Anyone who obtains admittance can eat at the cafeteria. The same kind of food is served to all and the sales are retail sales to the ultimate consumer. See Wirtz v. Pickett Food Service, Inc., 414 F. Supp. 675 (D.N.Mex. July 8, 1968). As a matter of fact, even the food contract customers are part of the general consuming public. While an establishment will not normally be considered as retail, if it is not ordinarily available to the general consuming public, it does not have to be actually frequented by the general public in the sense that the public must actually visit it. 29 CFR § 779.319. Otherwise, the countless restaurant operations located in "industrial plants, office buildings, Government installations, hospitals and colleges" would lose their status simply because of a factually restricted clientele.

(2) The court likewise concludes that there is no legal significance in the mode of payment. At trial, the government conceded that its position would be considerably weakened if the food payment was made directly to the defendant rather than to the college at registration.

Such a narrow technical view is untenable in the practical application of the act to everyday business operations. A considerable number of retail sales are made daily where the payment goes to a third party such as American Express, Diner's Club, bank credit plans, private and civic clubs, lease arrangements, salary check-offs, and the like wherein the seller looks solely to the third party for payment. The retail characteristics of the transaction are not destroyed by such payments nor are such purchases considered for resale merely because the consideration passes through an indirect conduit either before or after the actual transfer. For example, can it be seriously argued that the pre-payment of quarterly civic club dues, including meals, converts the serving of the meal by the hotel or restaurant to the member-consumer into a non-retail transaction? The court thinks not.

In reaching this conclusion the court is not unmindful of the cases presented by the government typified by Mitchell v. Sherry Corine Corp., 264 F.2d 831 (4th Cir. 1959) and Goldberg v. Warren G. Kleban Engineering Corp., 303 F.2d 855 (5th Cir. 1962). In those instances, however, there was no contact by the employer involved with the ultimate consumer nor were the sales at the very end of the stream of distribution which are the salient features of a retail sale.

In summary, the court rules that:

(a) The defendant's operation constitutes a retail establishment within the meaning of 29 U.S.C.A. § 213(a) (2) (1961) in that 75 per cent of its sales are not for resale and is recognized as retail sales in the particular industry.

(b) The defendant's employees are, within the meaning of 29 U.S.C.A. § 213 (a) (20) (1961) and 29 U.S.C.A. § 13 (b) (18) (1966), employees of a retail or service establishment employed primarily in connection with the preparation or offering of food or beverages for human consumption.

(c) The defendant's operation constitutes a "restaurant" and its employees are employed by such an establishment within the meaning of 29 U.S.C.A. § 13(b) (8) (1966).

It follows that the defendant is entitled to such exemptions and judgment is therefore entered in favor of the defendant.

It is so ordered.