George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

HASAM REALTY CORP. and Irving Cowan, Defendants.

No. 69–818–Civ.

United States District Court,
S. D. Florida.

Aug. 5, 1970.

Beverley R. Worrell, Regional Solicitor, U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

Alfred Aronovitz, Miami, Fla., Warren J. Kaps, New York City, for defendants.

## MEMORANDUM OPINION

FULTON, Chief Judge.

The Secretary of Labor brought this non-jury action to enjoin Hasam Realty Corp., a Delaware corporation, and Irving Cowan, an individual, from violating the provisions of Section 15(a) (2) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 215(a) (2), hereinafter referred to as the Act, to restrain the defendants from withholding payment of minimum wages and overtime compensation due defendants' employees under the Act, and to recover interest and costs. The parties agreed in the pretrial stipulation that the plaintiff does not seek recovery of back wages which might have been due prior to June 27, 1967. Diplomat Hotel, Inc., State Nine Development Corporation, and Samuel Friedland, originally defendants in this cause, were dismissed by stipulation of all parties at the early stages of the trial. The Court has jurisdiction of the cause pursuant to Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217 and 28 U.S.C. §§ 1337 and 1345.

The parties have stipulated that the employees enumerated by class in the joint pretrial stipulation are employed "in an enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Sections 3(r) and 3(s) (1) of the Fair Labor Standards Act, 29 U.S.C. §§ 203(r), 203 (s) (1), as amended by the Fair Labor Standards Amendments of 1961. The embodiment of the enterprise for purposes of this litigation is the defendant Hasam Realty Corp., a Delaware corporation which owns, operates and controls certain facilities, as follows:

(a) Diplomat East (hotel)
3515 South Ocean Drive
City of Hollywood
Broward County, Florida

(b) Diplomat West (motel)
3514 South Ocean Drive
City of Hollywood
Broward County, Florida

(c) Diplomat Inn, a/k/a Diplomat Golf and Racquet Club (motel)
1701 East Hallandale Beach Blvd.
(East of Diplomat Parkway)
City of Hallandale
Broward County, Florida

(d) Diplomat Country Club (clubhouse and golf course)
1701 East Hallandale Beach Blvd.
(West of Diplomat Parkway)
City of Hallandale
Broward County, Florida

(e) Diplomat Presidential Country Club (clubhouse and golf course)
19650 N. E. 18th Avenue
Dade County, Florida

These facilities are advertised to the public by the defendants as the "Diplomat Resorts and Country Club, Holly-wood-By-The-Sea, Florida." Defendants' Exhibit No. 1, consisting of a binder containing promotional literature, at page 8 describes the Diplomat Resorts as follows:

> The Diplomat offers three distinctive types of accommodations. The regal Diplomat East overlooks the sparkling ocean. The lovely Diplomat West cuddles casually on the Inland Waterway. The informality of the Diplomat Golf and Racquet Club is the golfer's favorite. These accommodations will respond to all of your expectations. Whether you select the East * * * the West * * * or the Golf and Racquet Club—all of the magnificent facilities of the entire resort are available for your pleasure.

The function, operation and offering of these facilities is designed to preserve the distinctive character of each.

The first building constructed by the defendant enterprise was the Diplomat West, located west of Highway A–1–A. Originally opened in December 1957, this building was a 150 room, two story motel located on the Intracoastal Waterway. Sometime in 1965, a four story addition was added to the Diplomat West. The Diplomat West is designed for guests with families interested in casual living, and is equipped with kitchenettes, a supervised children's playground, and a teens' rumpus room. The rates at the Diplomat West are generally higher than at the Diplomat Inn, and lower than at the Diplomat East.

At the same time the Diplomat West was opened, the original golf course was opened one to one and one-fourth miles away at the Diplomat Country Club, located on the west side of the Diplomat Parkway. At that time, business was not as good as today, and the hotel accepted a limited number of annual memberships from local residents. Since that year, no additional local members have been solicited or accepted, but the original members have been permitted to renew such annual membership. By initially combining local memberships with guests, the original golf course has been at capacity since the first year of operation.

In 1958 the eight story Diplomat East, located on the Atlantic Ocean east of Route A–1–A, was opened. It is currently the largest facility offering rooms to guests. The room rates are the highest of the three facilities offering rooms, and it contains the majority of banquet and meeting rooms. The Diplomat East houses night clubs featuring nationally known entertainers, and has leased departments including a ladies shop, a men's shop, a drug store, a candy—flower shop, shoe shop, an art gallery, a beauty shop, and a barber shop. All executive offices of the defendant corporation are located in the Diplomat East.

The next building to be completed was the Convention Hall, adjacent to the Diplomat East and connected to it by a covered bridge. This building was completed in 1959.

In 1960, the Diplomat Golf and Racquet Club, formerly known as the Diplomat Inn, was opened. This facility is located on the original golf course near the tennis court, one and one-quarter miles by automobile from the Diplomat West. The distance by Intracoastal Waterway and Lake Villa is slightly less. The Inn is on the east side of the Diplomat Parkway, approximately 500 feet from the Diplomat Country Club located on the west of the Diplomat Parkway.

The next facility to be completed was the Presidential Country Club and Golf Course, opened in 1963. This facility is located approximately five miles south of the main Diplomat complex, and is the only Diplomat facility located in Dade County. It is not accessible by waterway. At the time this facility was built, there was no land available for a golf course adjacent to the Diplomat East, Diplomat West, Diplomat Golf and Racquet Club, and Diplomat Country Club. It was built to accommodate an increasing number of motel and hotel guests, particularly during the winter rush sea-

son. At the present time, a third golf course location west of the Florida Turnpike and the City of Miramar, in Broward County, is being contemplated.

Thus, the motel, hotel, and recreational facilities operated by defendants grew as defendants built a successful business. And the business, in turn, has increased as the property expanded. As the business has grown, the sales and volume of business have increased. For example, the anuual dollar volume of sales done by the defendant corporation commencing January 1, 1966, and for each year thereafter was as follows:

| | |
|---|---|
| 9/30/66 | $10,335,023 |
| 9/30/67 | 11,162,457 |
| 9/30/68 | 12,397,551 |
| 9/30/69 | 12,550,335 |

There is presently under construction a 16 story oceanfront tower located near the Diplomat East which will provide an additional 327 rooms. At the present time, the combined total of motel and hotel rooms is 850 rooms.

In describing the room facilities at the three different locations (West, East, and Inn), Irving Cowan, President and Chief Executive Officer of the Diplomat, testified that the guests of the Inn are generally those people who want to be closer to the sports facilities and within walking distance to the clubhouse and the tennis courts without taking their own car or the shuttle bus. On the other hand, the West generally attracts more of the family clientele, particularly families with children. Both the Inn and the West have a less formal atmosphere than the Diplomat East.

Pricing of rooms follows the same pattern. Rates depend upon accessibility to a central area which the guests may want to visit. The rates depend upon the desirability of size of room, whether the room has a balcony, and whether the room has a kitchenette. For example, rooms with kitchenettes are available only at the Inn and the West, while terrace balconies are available only at the East on rooms facing the ocean.

In enacting the Fair Labor Standards Act, Congress declared that the existence of labor conditions detrimental to the maintenance of a minimum standard of living necessary for health, efficiency and general well being of workers burdens commerce, constitutes an unfair method of competition, and leads to labor disputes burdening and obstructing commerce. The purpose of the Fair Labor Standards Act, which establishes minimum wage and overtime compensation rates, is to eliminate such adverse conditions. 29 U.S.C. § 202. Accordingly, Courts have consistently held that the burden of proving an exemption from the protection of the Act is upon the employer-defendants. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); Acme Car & Truck Rentals, Inc. v. Hooper, et al., 331 F.2d 442 (5 Cir. 1964); Acme Tire and Battery Co., Inc. v. Wirtz, 330 F.2d 116 (5 Cir. 1964).

Minimum wage and overtime compensation standards are specified by Sections 6(a) and 7(a) (1) of the Act, 29 U.S.C. §§ 206(a), 207(a) (1). There can be no question but that the defendants are "employers" within the meaning of 29 U.S.C. §§ 206(a), 207(a) (1) and 203(d), and that they employ "employees" in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. §§ 203(r) and (s). They are therefore covered by the wage and hour provisions of the Act unless they can establish entitlement to an exempt status.

Defendants seek exemption from the overtime provisions under Section 13(b) (8) of the Act, 29 U.S.C. § 213(b) (8), as amended by the Fair Labor Standards Amendments of 1966. Before those amendments, Section 13(a) (2) of the Act exempted employees employed by an establishment which is a hotel, motel, restaurant or a seasonal recreational or amusement establishment, even though such establishment is in a Section 3(s) enterprise and has an annual dollar volume of more than $250,000. 29 U.S.C. § 213(a) (2) (ii). Currently, Section

13(b) (8), as amended in 1966, provides that:

> The provisions of section 7 shall not apply with respect to * * * (8) any employee employed by an establishment which is a hotel, motel, or restaurant; * * *

At the trial, the Secretary offered no proof on his claim for back wages for certain Diplomat employees. It was agreed that the scope of this action would be strictly limited to a consideration of whether the Diplomat complex constitutes a single hotel establishment within the meaning of 29 U.S.C. § 213(b) (8), so that it would be exempt from the overtime provisions of 29 U.S.C. § 207. It was further stipulated that the issue of allowable damages, if any, would be reserved for a later hearing, if liability were found in this proceeding, so that representatives from both sides could meet, transcribe time and payroll records from microfilm and data processing materials, and confer on the amount of damages allowable.

The Secretary does not deny that the exemption applies to employees exclusively employed by a motel, hotel or restaurant establishment under either the old or new law. See 29 C.F.R. §§ 779.309–.311 [republished April 9, 1970, 35 Federal Register 5879, et seq., without material change; added 779.311(b), at page 5880]. The question in this case is whether defendants' entire complex is an exempt hotel, as contended by defendants, or whether the complex, an "enterprise" within the Act, has five separate and physically distinct places of business or establishments, as contended by the Secretary. If the latter, the Secretary contends that the exemption might be lost for employees who perform central office operations and functions for the entire *enterprise* as distinguished from an exempt *establishment*. Mitchell v. Kroger Co., 248 F.2d 935 (8th Cir. 1957).

The Secretary specifically contends that certain categories of employees set out in defendants' Exhibit No. 2, a payroll classification list, are within the coverage of the Act, and not exempted.

These categories should be briefly described. The first category is comprised of those employees who work in the reservation office. A single reservation office handles all reservations for the Diplomat facilities. If the caller is not familiar with the hotel, or is a first time visitor, the reservation personnel are instructed to carefully describe the properties generally, where each building is located, what facilities may be available, the type of accommodations in each building, and the general rates. The reservations office utilizes a wide area telephone system connecting reservation offices in Atlanta, Chicago, Detroit, and Miami. This switchboard, the reservations office, and general offices of Hasam Realty Corp. are located in the Diplomat East. The service or baggage department includes two employees in the Diplomat East, who handle the receipt and delivery of goods, parcel post mail, and baggage for guests in all of the Diplomat facilities. U. S. Mail for all Diplomat facilities is usually addressed to 3515 South Ocean Drive, Hollywood, Florida, the address of the Diplomat East.

The Social Department is made up of several adult hostesses and counselors who supervise children's activities. All guests from all Diplomat accommodations may participate equally in the social activities held on the various properties. Social offices are maintained in both the Diplomat East and the Diplomat West, although children's activities are headquartered in the Diplomat West. The Food Director and Catering Office consists of supervisory and service personnel and the secretary in the catering office. These employees handle the paper work in connection with banquets and food functions held in any one of the five properties of the Diplomat. The Storekeeper and Driver Department includes truck drivers and food storeroom personnel. The latter are headquartered in the East Building. Drivers move food trucks between the various properties, making deliveries to the kitchens. The Telephone Department includes the chief

operator, supervisors, and all telephone operators, who work out of a central switchboard room located on the lower level of the Diplomat East, providing telephone communications with all of the properties.

The Food Control Office is under the supervision of the food controller, a specialized accountant who utilizes clerks and bookkeepers handling cost records for the food departments. The Valet Shop is located in the lower level of the Diplomat East and employs pressers and valet workers who handle pressing and valet work from all Diplomat properties. The Executive Office consists of the defendant Irving Cowan and two general secretaries. Their offices are located on the lobby floor of the Diplomat East. The classification "sales" is used for approximately six or seven secretaries and a file clerk in the sales office, located on the messanine floor of the Diplomat East. The Accounting Department is under the direction of the treasurer and comptroller, and is responsible for maintaining all payroll records and accounting and financial information relative to the operation of all Diplomat properties. The Receiving and Storeroom classification refers to receiving clerks who work the back platform of the Diplomat East where merchandise for the Diplomat properties is received and reissued by defendants' vehicles to an ultimate destination at one of the other properties. The Purchasing classification consists of a single purchasing agent in charge of all purchasing. The Public Relations classification is comprised of a single secretary who works in the publicity office under the direction of a public relations director on contract from an outside firm which provides public relations service for the Diplomat properties.

The Repair and Maintenance Department encompasses building maintenance personnel subdivided into two classifications, "maintenance" and "gardeners" with the latter referring to landscaping. Maintenance employees are individually assigned to take care of maintenance and repairs on all Diplomat properties. The gardeners in this classification perform landscaping services at the Diplomat East, the Diplomat West and the Golf and Racquet Club, as distinguished from the golf courses. The Golf Course classification includes two crews for each golf course. There is nothing in company policy to prohibit the interchange of employees on the golf course crews as may be required in any particular instance. The Laundry classification includes all employees working in the hotel laundry, which washes and irons bed linen, sheets and pillow cases, towels and dining room nappery. The laundry is used solely and exclusively for internal operations. The Print Shop includes employees involved in printing literature used in the sales and advertising operations of the Diplomat properties. The Door Department includes transportation employees who drive Volkswagen shuttle buses and doormen at the Diplomat East who park cars for guests. The shuttle bus service involves three vehicles and two shifts of drivers operating seven days a week to all of the Diplomat properties, including the Presidential Country Club. In addition to the shuttle buses, a ferry boat operates across the Intracoastal Waterway and can transport guests to and from the Diplomat West to the Diplomat Golf and Racquet Club or the Diplomat Country Club via Lake Villa and the DeSota Waterway.

Defendant Irving Cowan has, throughout the period from October 25, 1966 to the present date, actively managed the business affairs of the corporate defendant and directed the employment policies and practices with respect to hiring, firing, and overtime and wages of the employees employed by defendants in the Diplomat facilities. Employees are hired through the central office as needed and are interchanged between the various facilities as needed.

Section 3 of the Act, 29 U.S.C. § 203, provides definitions of various terms used in the Act, including "employ," "employer," and "enterprise." The parties have stipulated that Hasam Realty Corporation employs employees (in the

classes described, *supra*) in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the Act. The question for this Court is whether the Diplomat complex, stipulated to be an enterprise within the Act, is also a single establishment, or whether it is five separate establishments, as the term "establishment" is used in the exemption provided by 29 U.S.C. § 213(b) (8). The Secretary contends that the § 213(b) (8) exemption is unavailable with regard to employees who perform central office operations for the entire Diplomat *enterprise,* as opposed to those who work for the separate *establishments* of which the Secretary argues the Diplomat is comprised.

There is serious question whether the Mitchell v. Kroger Company, 248 F.2d 935 (5 Cir. 1957) case relied upon by the Secretary to support his theory regarding employees performing centralized functions has any real applicability to this case. The *Kroger Company* case dealt with auditors working out of a branch office of a grocery chain who traveled substantial distances across state lines to audit the books kept by retail stores in the chain, and the Court held that the auditors were not employed by an exempt retail establishment, even though they performed work inside such establishments. Traveling auditors are very different from centralized employees servicing a hotel complex. However, the defendants have not pressed this difference, but instead have based their defense solely on the ground that the Diplomat enterprise is housed in one single establishment within the meaning of the Act, and that the centralized employees therefore are employed by a single exempt hotel establishment, rather than being employed by the Diplomat enterprise to service several distinct establishments.

█ The word "establishment" is not defined in the Act. Furthermore, the hotel exemption of § 213(b) (8) is of recent vintage and is therefore supported by very little case law. The Secretary

of Labor has, however, issued an interpretive bulletin which, although not binding on the Courts, is entitled to careful consideration. Wirtz v. Keystone Readers Service, Inc., 418 F.2d 249 (5 Cir. 1969). Pertinent provisions of this bulletin are as follows:

Some exemptions depend on the character of the establishment by which an employee is employed.

\* \* \* \* \* \*

[T]he term "establishment" as used in the Act means a distinct physical place of business. The "enterprise" \* \* \* may be composed of a single establishment. The term "establishmen," however, is not synonymous with the words "business" or "enterprise" when those terms are used to describe multiunit operations.

\* \* \* \* \* \*

Although \* \* \* two or more departments of a business may constitute a single establishment, two or more physically separated portions of a business though located on the same premises, and even under the same roof in some circumstances may constitute more than one establishment for purposes of the exemptions.

\* \* \* \* \* \*

[T]he retail portion of an establishment would be considered a separate establishment from the unrelated portion for the purpose of the exemption if (a) it is physically separated from the other activities; and (b) it is functionally operated as a separate unit having separate records, and separate bookkeeping; and (c) there is no interchange of employees between the units. 29 C.F.R. §§ 779.302, 779.-305 (1970).

While this portion of the bulletin is couched primarily in terms geared to the retail or service establishment exemptions, it is nevertheless helpful as indicative of the Department of Labor interpretation of the word "establishment."

Applying the criteria of the Interpretive Bulletin, the Diplomat clearly con-

sists of a single establishment within the meaning of the Act. Four of the five main facilities are on physically contiguous parcels of land. The Presidential Country Club and Golf Course is located some five miles from the other buildings, but only because the price of land at the time of its construction made it economically unfeasible for the Diplomat to provide its guests with additional golf facilities closer to the main hotel units. No separate books and records are kept for the various facilities. The general accounting department maintains payroll, financial, and accounting records for all Diplomat properties. Nor are employees hired to work solely in one of the five units. Hiring is done through a central office, and employees are interchanged between the various facilities, as needed.

The Court has carefully studied the cases propounded to support the Secretary's position in this case, and has found them inapposite to the Diplomat Hotel. In Shultz v. Adair's Cafeterias, Inc., 420 F.2d 390 (10 Cir. 1969), the Court considered the restaurant exemption. That case involved workers in a central bakery who provided pastries to six cafeterias managed by a single parent holding company. The six cafeterias were situated in and about Oklahoma City. The Court found that the bakery was not only physically separated from the other corporations, but that it was independently managed, and was a separate corporation. The cafeterias and bakery were related only by their common ownership by a holding company. In A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945), the Court construed the words "retail establishment" to determine availability of an exemption. That case involved a grocery store chain. The chain was comprised of 49 stores, all serviced by a centralized warehouse. The Court found that the warehouse constituted a separate establishment under the Act. This Court is simply unable to see any strong similarity between a central bakery providing pastries for six

separate cafeterias, or a central warehouse servicing a vast chain of grocery stores, and the Diplomat Hotel.

The Secretary has also propounded Mitchell v. Bekins Van & Storage Company, 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed. 2d 589 (1957), in support of his theory. That case reversed a holding that five physically separate warehouses constituted a single retail establishment within the meaning of the § 213(a) (2) exemption. Mitchell v. Bekins Van & Storage Company, 231 F.2d 25 (9 Cir. 1956). The five warehouses were operated as a unit, but were scattered throughout downtown Los Angeles. The Supreme Court held these warehouses to be separate establishments. However, this was a one paragraph *per curiam* opinion giving no explanation of the factors utilized by the Court in making its decision. A more recent warehouse case is Lewis v. Brandt Furniture, Inc., 402 F.2d 265 (5 Cir. 1968). In that case the Court of Appeals held that a building maintained as a warehouse for two retail furniture stores did not constitute a separate establishment. The Court is not impressed with the precedent value of *Bekins* for purposes of the case at bar.

The great weight of the evidence in this case is that the Diplomat Hotel is a functional, cohesive unit. Because of sheer size and the variety of services offered to its guests, it is housed in five separate main facilities, but each is part and parcel of the whole. The Diplomat is a resort hotel, providing housing, convention, athletic, shopping, and entertainment facilities. It has numerous swimming pools, two golf courses, tennis courts, and night clubs, all primarily for the use of hotel guests. While it is true that one golf course is located at some distance from the main complex, this was necessitated by the scarcity of suitable land upon which it was economically feasible to locate a golf course. The hotel golf facilities are a major attraction to potential hotel guests. The courses are operated primarily for hotel guests, and such persons are given preferences in starting times. Indeed, during the win-

ter season the capacity of the two extant courses is insufficient to accommodate the registered guests of the Diplomat, and construction of a third course is contemplated.

The employees sought to be characterized as "central" by the Secretary are employed by the Diplomat Hotel, not by a separate facility within the hotel complex. The hotel facilities have common ownership and a common payroll. No separate records are maintained, and employees are interchanged among the hotel facilities, as needed.

The Diplomat Hotel, Inc., although composed of a complex of five separate facilities, is a single hotel establishment within the meaning of 29 U.S.C. § 213(b)(8).

This memorandum opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Counsel for the Secretary of Labor shall forthwith prepare and submit a form of final judgment in conformity herewith.