Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

GOOSE CREEK CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, Defendant-Appellant.

No. 74–1485.

United States Court of Appeals, Fifth Circuit.

Sept. 11, 1975.

**54**

Richard A. Peebles, Baytown, Tex., for defendant-appellant.

George T. Avery, Regional Sol., James E. White, Joan T. Winn, Attys., U. S. Dept. of Labor, Dallas, Tex., William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Carin Ann Clauss, Donald S. Shire, James B. Leonard, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellee.

Before RIVES, GODBOLD and GEE, Circuit Judges.

RIVES, Circuit Judge:

In this case brought by the Secretary of Labor under the Fair Labor Standards Act,[1] the district court found that the Goose Creek Consolidated Independent School District (school district) discriminated against its female janitors by paying them less than it paid its male janitors. On appeal, the school district argues that the findings are based on an erroneous legal concept, are incomplete and are clearly erroneous. We affirm.

The school district operates thirteen (13) elementary schools serving students living near Houston, Texas. This suit involves the pay of 24 male janitors and 40 female janitors employed since May 19, 1969,[2] at eleven of those schools.[3] Prior to 1972 the school district classified the janitors as maids, custodians and head custodians, and in 1972 reclassified them as Custodians I, II and III. The job descriptions provided that a Custo-

---

1. 29 U.S.C. § 201 *et seq.*

2. The two year statute of limitations in 29 U.S.C. § 255 bars suits on violations prior to that date.

3. Alamo, Ashbel Smith, Stephen F. Austin, James Bowie, Carver-Jones, Harlem, Highlands, Mirabeau B. Lamar, Pumphrey, San Jacinto and William B. Travis.

dian I (maid) would do light cleaning; a Custodian II (custodian) would do heavy cleaning, pick-up and dispose of trash inside and outside the buildings, operate heavy equipment, move furniture and supplies, and perform minor repairs; and a Custodian III (head custodian) would perform all the above duties and, in addition, would place orders for supplies and inspect the school building to which he was assigned. The school district conceded and the district court found that the job descriptions did not accurately describe the work performed by the janitors. A typical[4] male or female janitor's day began with unlocking the doors to the school. After classes began, the janitors swept the halls, picked up trash outside the building and cleaned the restrooms. During the lunch hour, all the janitors assigned to a building helped in the cafeteria by cleaning tables, stacking trays and performing other necessary jobs. After the students were dismissed, both male and female janitors cleaned classrooms, moving furniture alone unless it was too heavy for one person to handle and also waxing floors with the heavy buffing machines. Of the janitors testifying at trial, only some of the men and a few of the women stated that they made minor repairs, such as replacing burned-out lights, tightening loose screws on door hinges, attaching pencil sharpeners, and unstopping clogged plumbing. The school district records indicate that the principal of each school often requested repairmen from the central office to perform the minor repairs which the janitors asserted they routinely performed.[5]

The school district paid the male janitors substantially more than it paid the female janitors, as the following table shows.

| School Year | Female | Male |
|---|---|---|
| 1969–1970 | $1.46–$1.56/hr.[6] | $2.39–$2.65/hr.[7] |
| 1970–1971 | $1.60–$1.67/hr.[8] | $2.57–$2.80/hr. |
| 1971–1972 | $1.80/hr. | $2.60–$2.85/hr. |
| 1972–1973 | $1.90/hr. | $2.65–$3.00/hr. |

After the Department of Labor began its investigation, the school district allowed three of the female janitors to become supervisors at the following pay scale:

| | | |
|---|---|---|
| Ethel Haggerty: | 1971–72 | $2.50 an hour |
| | 1972–73 | $2.60 an hour |
| Beatrice Frazier: | 1971–72 | $2.50 an hour |
| | 1972–73 | $2.60 an hour |
| Marie Auyenne: | 1971–72 | $2.55 an hour |
| | 1972–73 | $2.65 an hour |

The school district also hired two other women to be supervisors, but paid them less than it did the three women who had been promoted from within the system. The school district hired one man for the 1971–72 school year and paid him $2.00 an hour, but the following year raised his salary to the same level as that of Marie Auyenne, the highest paid female janitor. The school district also hired four other men for the 1972–73 school year and paid them $2.00 an hour, which was more than the wage paid most of the women, some of whom had been with the district for several years. The hourly wage paid the five female supervisors, three of whom replaced male supervisors, was less than the men's hourly wage the year previous to the women's promotions. A committee of school administrators from throughout the school district determined the pay scales and placed individuals within the scales. Although the committee purportedly rewarded merit with pay raises, the

4. Not all janitors worked the same hours. Some began work in the afternoon and worked into the night. Nevertheless, all the janitors spent most of their time performing the same duties as performed by the "typical" janitor.

5. The requests came from *all* the schools.

6. Two women were paid more—one $1.64 an hour and the other $1.76 an hour.

7. Most of the men made $2.57 an hour.

8. Three women made between $1.73 and $1.79 an hour.

criteria used to delimit merit were not completely revealed by the record. Despite the goals of the evaluation committee, the male janitors were usually rewarded more generously then the female janitors.

On appeal, the school district argues that

(1) The district court incorrectly treated the school district as one "establishment" [see § 6(d)(1) of the Act, 29 U.S.C. § 206(d)(1)];

(2) the district court's finding that the work of men and women was equal is clearly erroneous; and

(3) the district court's findings of fact fail to account for aspects of the male janitor's work which made him deserving of higher wages.

Originally, both the Department of Labor and the school district agreed that each of the eleven elementary schools was a separate establishment for the purposes of section 6(d)(1) of the Act. The trial judge, impatient with the slow pace of the trial, said that it would be unnecessary to bring witnesses from each school, for he thought that the entire district was one establishment.[9] The judge said:

"I'm considering [the school district] as one separate business enterprise within the purview of the Fair Labor Standards Act. Now, if there is different pay, different work, and different characteristics with respect to a single school, I'm happy to hear it and pass on it." (App. 12, R. 87.)

Relying on regulations promulgated by the Department of Labor, the school district argues that each elementary school, rather than the school district as a whole, is a separate "establishment." The school district's contention does not square with the facts of this case. The record reveals that the central adminis-

tration of the school district (not the principals of the schools) hired the janitors, determined their wages, assigned them to the school building in which they were to work, and sometimes switched their assignments from one building to another. Finally, the record discloses that the work schedule and the janitors' daily duties—controlled to a large extent by the central administrators—do not differ from building to building.

■ Treating the school district as one establishment is more reasonable than treating each unit as a separate establishment and is contrary neither to the administrative regulations nor the judicial constructions of the statute. The regulations, which were meant to state the Department of Labor's official interpretation of the Fair Labor Standards Act (see 29 C.F.R. 779.0), provide that "[T]he term 'establishment' . . . refers to a 'distinct physical place of business' rather than to 'an entire business or enterprise' which may include several separate places of business" [29 C.F.R. 779.24]. Later in 29 C.F.R. 779.-03, the regulations state that "[i]n the case of chain store systems, branch stores, groups of independent stores organized to carry on business in a manner similar to chain store systems, and retail outlets operated by manufacturing or distributing concerns, each separate place of business ordinarily is a separate establishment" (emphasis supplied). Thus, the administrative regulations recognize that there may be situations in which a single establishment could include operations at more than one physical location.[10] Judicial construction of the word "establishment," as used in other sections of the Fair Labor Standards Act, also recognizes that it may apply to operations at different physical locations. Particularly helpful are cases construing section 13(a)(2) [29 U.S.C. § 213(a)(2)],

---

9. Nevertheless, witnesses from every school did testify.

10. Great deference must be given to the opinion of an administrative body on matters within its area of expertise, but ultimately statutory construction is for the court.

which provides an exemption from the requirements of the Act for employees "engaged in any retail . . . establishment." The Supreme Court held in *Phillips Co. v. Walling,* 1945, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, that a corporation which operated 49 retail grocery stores and a central warehouse was not a single retail establishment. Construing the *Phillips* opinion, the Eighth Circuit held that two photography shops were not a single establishment. See *Mitchell v. Birkett,* 8 Cir. 1961, 286 F.2d 474. There the Court noted that the locations of the two shops were widely separated and that the film processing facilities at one of the shops served a number of drugstore photography departments. In *Brennan v. Yellowstone Park Lines, Inc.,* 10 Cir. 1973, 478 F.2d 285, the Tenth Circuit held that, for purposes of section 13(a)(3), a company which operated concessions throughout the national park was not a single establishment, because of the heterogenous nature of its operations and the distances separating them. The opinion did not reach the situation where a company's operations at different locations are identical.

This Court has held that, for purposes of section 13(a)(2), a market, liquor store and restaurant operated in conjunction with a neighboring barbeque stand constituted one establishment. See *Mitchell v. Gammill,* 5 Cir. 1957, 245 F.2d 207. In *Wirtz v. Campus Chefs, Inc.,* N.D.Ga. 1968, 303 F.Supp. 1112, the Northern District of Georgia held that a food service company operating two cafeterias for a college was a single establishment. Significantly, one cafeteria was in the central campus area, while the other was in a downtown hotel which had been converted into a dormitory. The Southern District of Florida similarly held that a corporation which operated four adjoining hotels and a golf course located some distance away (used primarily by guests of the hotels) was a single establishment under section 13(b)(8) [another exemption closely related to § 13(a)(3)].

See *Shultz v. Hasam Realty Corp.,* S.D. Fla.1970, 316 F.Supp. 1136. Thus, the courts applying *Phillips, supra,* have held that businesses operating at more than one location may be treated as a single establishment.

It may well be that an even broader interpretation of the word "establishment" would be appropriate outside the context of section 13(a)(2). As Justice Murphy, writing for the majority in *Phillips, supra,* said:

"The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and ummistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." 324 U.S. 490, 493, 65 S.Ct. 807, 808.

Section 6(d)(1), unlike section 13(a)(2), does not provide an exemption from the coverage of the Act. A narrow construction of the word "establishment," as used in section 6(d)(1), might make proof of discrimination more difficult, thus frustrating congressional intent. A case closely in point is *Shultz v. Corning Glass Works,* W.D.N.Y.1970, 319 F.Supp. 1161, *modified* 474 F.2d 226, *affirmed* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1, which involved the wages of female and male inspectors at three plants. Two of the plants adjoined each other, shared central offices, and inspectors at each plant were subject to transfer to the other plant. Inspectors at the nearby third plant were not subject to transfer. The court held that the two plants, whose inspectors were subject to trans-

fers, constituted a single establishment under section 6(d)(1).[11]

■ On facts identical with those in the instant case, at least two district courts have concluded that janitors working for a single school district but assigned to various school buildings within the district are employed by a single establishment for purposes of the Fair Labor Standards Act. See *Brennan v. Board of Education, Jersey City, New Jersey,* D.N.J.1974, 374 F.Supp. 817; *Hodgson v. School District,* S.D.Calif. 1972 (not officially reported) 21 WH Cases 123, 71 CCH Lab.Cas. ¶ 32,920. In the present case, a central authority was responsible for the janitors' employment and wages and often transferred them from one school to another. The school district failed to show any difference in the janitors' working conditions at the eleven schools. We, therefore, hold that the janitors were employed by one "establishment"—Goose Creek Consolidated Independent School District.

■ The district court made full findings of fact which we conclude are amply supported by the record. The testimony reveals that both male and female janitors performed identical minor repair jobs. As a matter of law, that testimony required the district court to find that the work of the janitors—male and female—was equal. See *Hodgson v. Behrens Drug Co.,* 5 Cir. 1973, 475 F.2d 1041, 1049.

■ The school district also argues that the district court's findings of fact were incomplete in that they failed to take into account that the male janitors were subject to emergency calls and had the duty of reporting needed repairs for buildings. It is only necessary for a district court to make findings of fact that are "sufficiently comprehensive and pertinent to the issues to provide a basis for decision." *Gulf King Shrimp Co. v.*

*Wirtz,* 5 Cir. 1969, 407 F.2d 508, 515, quoting from *Carr v. Yokohama Specie Bank, Limited,* 9 Cir. 1952, 200 F.2d 251, 255. See *Elam v. United States,* 6 Cir. 1958, 250 F.2d 582. Also see *Rayonier, Incorporated v. Polson,* 9 Cir. 1968, 400 F.2d 909. The responsibility for reporting problems was part of the general supervisory duties which the district court found were shared by both sexes. As for the supposed duty of "being on call" for emergencies, it is far from clear that all the men were aware that they had that duty. Two long-term male employees testified that they had never been called back for emergency duty. It is unnecessary to remand for further findings on these matters.

Accordingly, we affirm the judgment of the district court.

Affirmed.

GEE, Circuit Judge (specially concurring):

While I agree with the result in this case and the reasoning of the majority as regards equality of job content, I cannot join in all that is said about the definition of "establishment." Specifically, I do not think a reliable general test, designed to fit all FLSA cases, can or should be founded on the factual basis provided by this unique defendant—the school district. Since the opinion may be read as attempting such a test and since the test could conflict with administrative regulations and interpretation on the subject in certain instances, I am compelled to set out—to some extent repetitively—the factors that, for me, conclude the issue. First, the central administration acted as the hiring authority for all the schools in the system. Wage scales and job classifications were also set by the district administration office. The central administration assigned the individual janitors to schools and occasionally switched janitors from one school to another. According to one

11. The Seventh Circuit reached a similar conclusion. Its decision in *Hodgson v. Miller Brewing Co.,* 7 Cir. 1972, 457 F.2d 221, could be interpreted as an implicit holding that two laboratories, making different tests and located in separate buildings in a plant complex, were a single establishment.

district official, janitors were expected to use whatever individual skills they had in dealing with maintenance problems before calling the district maintenance department. Although there is evidence that the maintenance department was often called even for minor repairs, to some extent the custodial service was functionally integrated into the centrally-operated, district-wide maintenance department. A district official also testified that evaluation of janitors for so-called merit increases was not solely in the hands of individual principals. In fact, the principals consulted and reached a decision *with* the Deputy Supervisor in charge of maintenance, an official with district-wide responsibility and one who received supply orders sent in by the janitors. Finally, on a broader scale, the schools in the district are under common control and a unified plan to provide educational services within the district.

On such facts, we cannot hold the court below clearly erroneous in finding the district one "establishment," as appellant asks us to do. I stress again, however, my belief that other cases must await their day in court.