**Margaret Mary GRUMBINE, Plaintiff,**

**v.**

**UNITED STATES, et al., Defendants.**

**Civ. A. No. 82–1938.**

United States District Court,
District of Columbia.

April 3, 1984.

Michael J. Riselli, Riselli & Pressler, Washington, D.C., for plaintiff.

Ann S. DuRoss, Asst. U.S. Atty., Michael D. Goldman, U.S. Dept. of the Treasury, Washington, D.C., for defendants.

Ruth A. Ihne, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for amicus curiae Women's Legal Defense Fund.

## OPINION

HAROLD H. GREENE, District Judge.

This case involves a significant issue of first impression: what is the meaning of the term "establishment" under the Equal Pay Act for purposes of employment in the federal government?

Plaintiff Margaret Mary Grumbine was a Regional Counsel of the Customs Service assigned to Baltimore, Maryland. At all times pertinent to this lawsuit, the Customs Service was divided into nine regions [1] and so was the Chief Counsel's Office of that Service.[2] Although each of the other eight individuals serving as Regional Counsel in the Customs Service, all of them male, had a GS–15 rating, and although plaintiff's immediate predecessor, also a male, had that same GS–15 rating, plaintiff herself was classified and paid only as a GS–14. The government defends this action basically [3] on the ground that each Regional Counsel's Office is a separate "establishment" for purposes of the Equal Pay Act, and that, accordingly, it was not required to pay plaintiff at the same rate as the individuals serving as Regional Counsel in other "establishments," that is, elsewhere in the United States. Plaintiff and the Women's Legal Defense Fund, which was permitted to participate as *amicus curiae*, argue on various bases that, at least in the context of the federal Civil

Service, the term "establishment" has a far broader meaning.

## I

■ The Equal Pay Act, 29 U.S.C. § 206(d), enacted as an amendment to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, was "intended as a broad charter of women's rights in the economic field." *Shultz v. Wheaton Glass Company*, 421 F.2d 259 (3rd Cir.1970). To that end, it was designed to eliminate all wage discriminations based on sex which the Congress had found in 1963 to continue to exist on a substantial scale.[4] The issues in this case must be considered with these basic purposes in mind.[5]

The government does not deny that Margaret Mary Grumbine was classified in a lower grade and was paid less than her male counterparts in the other Customs Service regional offices. In defense of that disparity, the government relies on section 206(d)(1) of the Act which provides in pertinent part that

No employer ... shall discriminate, *within any establishment* ... between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work (emphasis added).

In the government's view, the "establishment" to which the Court must look to determine whether plaintiff was underpaid is the Office of Regional Counsel in Baltimore—not the Civil Service, the Depart-

---

**1.** The Regional Offices were located in Boston, New York, Baltimore, Miami, New Orleans, Houston, Los Angeles, San Francisco, and Chicago.

**2.** The Office of Chief Counsel is one section in the Legal Division of the U.S. Department of the Treasury.

**3.** But see Part IV *infra*.

**4.** See, *e.g.*, 109 Cong.Rec. 9199 (Rep. Green); 109 Cong.Rec. 9212 (Rep. Ryan); 108 Cong.Rec. 14957 (Rep. Pubinski); 109 Cong.Rec. 9212 (Rep. Donahue); and see the statement of Presi-

dent Kennedy on the occasion of the signing of the Equal Pay Act, June 10, 1983, XXI Cong.Q. No. 24, p. 978 (June 14, 1983).

**5.** As Justice Frankfurter observed in *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943),

[r]egard to [the purposes of a law] should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.

ment of the Treasury,[6] or the Treasury's Office of Chief Counsel (with its nine subordinate Regional Counsels).[7] If that interpretation of the law is correct, plaintiff's classification and pay could not have violated the Equal Pay Act since there was no one in the Baltimore "establishment" who had a position like plaintiff's—she was the one and only, *the* Regional Counsel in that city.[8]

In defense of its interpretation, the government points out, correctly, that in a number of cases under the Fair Labor Standards Act the courts have held that an "establishment" is a "distinct physical place of business,"[9] and that employees working in separate locations or offices should not be compared for Equal Pay Act purposes.[10]

These lines of cases certainly do exist, and they hold what the government claims for them. However, in a number of other instances, and particularly in recent years, courts have not taken a strictly geographical view of the term "establishment" but have considered a multi-location employer to be a single establishment.

The seminal decision in that regard is that of Judge Rives, writing for the Fifth Circuit, in *Brennan v. Goose Creek Consolidated Independent School District,* 519 F.2d 53 (5th Cir.1975). That case involved alleged differentials in pay between men and women working as janitors for a school district composed of thirteen geographically separated elementary schools.

There, as here, the argument was made that each separate geographic entity, *i.e.,* each school, was a separate "establishment" for purposes of the Act. Relying on such facts as that the central administration of the school district did the hiring, determined the wages, and assigned the employees, and further that the duties of the various janitors did not differ from school to school, the court held that all the janitors were employed by a single "establishment" for purposes of the statute. To the same effect, see *Marshall v. Dallas Independent School District,* 605 F.2d 191 (5th Cir.1979); *Alexander v. University of Michigan-Flint,* 509 F.Supp. 627 (E.D. Mich.1980); *EEOC v. Maricopa County Community College District,* 29 Fair Empl.Prac.Cas. (BNA) 383 (D.Ariz.1982).

The question before the Court, then, is how these various decisions may be reconciled with each other and, more important, how they may be squared with the congressional purpose. It appears to the Court that, at a minimum, a distinction should be drawn for Equal Pay Act purposes between private and public employment.

The term "establishment" as a geographical concept had its root in the congressional effort to exempt certain local business establishments from the minimum wage and maximum hours provisions of the Fair Labor Standards Act.[11] Since coverage depended upon the volume of sales in any

---

**6.** The Women's Legal Defense Fund advocates a construction which considers the Civil service or the Treasury as an "establishment" for Equal Pay Act purposes.

**7.** Plaintiff appears to suggest that the Office of Chief Counsel is the appropriate "establishment."

**8.** On that basis, she would not have been paid "at a rate less than the rate at which [the government paid] wages to employees of the opposite sex in such establishment for equal work," in the words of the statute. There was no one in the Baltimore office, either of the same sex or of the opposite sex doing work equal to that done by the Regional Counsel. Thus, if plaintiff had been paid one-half or one-quarter as much as her counterparts assigned by

the Customs Service's Chief Counsel to other cities, there still would have been no Equal Pay Act violation.

**9.** See, *e.g., Mitchell v. Bekins Van and Storage Company,* 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed.2d 589 (1957); *Phillips Company v. Walling,* 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945); *Brennan v. Yellowstone Park Lines, Inc.,* 478 F.2d 285 (10th Cir.1973).

**10.** See, *e.g., Gerlach v. Michigan Bell Telephone Co.,* 448 F.Supp. 1168 (E.D.Mich.1978); *Alexander v. University of Michigan-Flint,* 509 F.Supp. 627 (E.D.Mich.1980).

**11.** See, *e.g.,* 29 U.S.C. §§ 207(h), 213(a)(2), 213(a)(3).

particular State,[12] it made sense to give to the term "establishment" a geographic meaning, and the older cases did just that. But this reasoning has little relevance to the Equal Pay Act provisions of the Fair Labor Standards Act, and even less so in the area of governmental employment, where typically central supervision exists and pay standards apply for an entire system irrespective of where the employee happens to be located. It would hardly make sense to permit an employer to rely on a geographic "establishment" concept in defense of an unequal pay practices when that employer has itself adopted a uniform, non-geographic pay policy and system.

It was on this basis that the courts in the more recent decisions referred to *supra* have departed from geography in applying the Equal Pay Act and have considered a public employer with a number of locations to be a single establishment.

Even the Department of Labor, upon whose regulations [13] the government strongly relies,[14] has taken this view. It has not followed a "distinct physical place of business" rule in enforcing the Equal Pay Act against public employers. In fact, in such cases as *Brennan v. Goose Creek, supra,* and *Marshall v. Dallas School District, supra,* it was that Department which

brought the suits against the multi-location employers, claiming that they had violated the Equal Pay Act by paying female employees in one location less than males in another.

■ It is clear from these decisions that, at least for purposes of public employment,[15] the geographic reach of the term "establishment" is not automatically determined by geography, as the government would have it, but depends upon the degree to which the particular governmental entity has centralized its personnel administration.

It remains to be determined how these principles are to be applied to employment in the federal Civil Service.

## II

The principle of equal pay regardless of sex was adopted for federal employment more than sixty years ago, with the Classification Act of 1923. That statute provided that

[i]n determining the rate of compensation which an employee shall receive, the principle of equal compensation for equal work irrespective of sex shall be followed.[16]

**12.** There are no similar exceptions with respect to federal Civil Service employees; no federal "establishments" are exempt from the minimum wage and maximum hour provisions of the Act.

**13.** See 29 C.F.R. § 800.108.

**14.** The Court rejects that reliance for several reasons. In the first place, the Civil Service Commission, not the Department of Labor, had administrative authority over federal employees under the Fair Labor Standards Act (29 U.S.C. § 204(f)) and the Labor Department regulations therefore lack binding authority. Moreover, these regulations were issued before the Fair Labor Standards Act was amended to include federal employees. See 30 Fed.Reg. 11504, as amended by 31 Fed.Reg. 2657 and 32 Fed.Reg. 2378. Further, these regulations were never regarded even by the Department as anything more than interim regulations pending ultimate resolution of the issues treated therein by the courts (see 29 C.F.R. § 800.2) and on that basis they do not reflect more recent law discussed *supra.* Finally, as noted above, the Department

itself has filed Equal Pay Act suits without regard to geographic limitations.

The Equal Employment Opportunity Commission, to which enforcement authority for the Equal Pay Act was transferred from the Department of Labor (Reorganization Plan No. 1 of 1978, 43 Fed.Reg. 19807 and 44 Fed.Reg. 37193) has promulgated proposed regulations which are quite different from the regulations of the Department of Labor; in fact, they support plaintiff's interpretation of the Equal Pay Act. See 46 Fed.Reg. 43848. Thus, whatever force remained with the Labor Department regulations has long been dissipated.

**15.** It may also be that, for the reasons discussed above, the "establishment" concept should not be given a narrow geographic focus where a private employer operates a highly centralized employment system. However, it is not necessary to decide that issue in this case, and the Court does not do so.

**16.** Classification Act of 1923, ch. 265, 42 Stat. 1488 (1923) § 4 (repealed 1949). Although the Act initially applied only to employees stationed in the District of Columbia, this was subsequent-

This principle was reaffirmed and broadened in the Classification Act of 1949 which remains in effect today.[17] Under that Act, the equal pay principle is not limited to employees working in one place: government-wide standards are issued by the Office of Personnel Management (see 5 U.S.C. § 5105)[18] and position classification decisions must comport with the equal pay principle. *Haneke v. Secretary of Health, Education and Welfare*, 535 F.2d 1291 (D.C.Cir.1976).

■ There is nothing in the Classification Act to suggest that Congress intended compliance with the equal pay principle to be limited by geographic location. The statute contains no such restriction, and the decided cases have superimposed none. To the contrary, the entire point and purpose of the various civil service laws is to provide uniformity of treatment for all employees, regardless of location.[19]

In implementation of that purpose, Congress has devised a number of means for ensuring that the principle of equal pay for equal work applies to the Civil Service in its entirety, as distinguished from fragments, whether geographic or otherwise. Thus, Congress has vested oversight responsibility for all classification decisions in the Office of Personnel Management (OPM).[20] Moreover, OPM hears all appeals of classification decisions;[21] it conducts independent reviews of the classification decisions of each agency;[22] and it has power to revoke the classification authority of an agency when it finds that the agency is not placing positions in grades in conformity with the published standards.[23]

There is no basis for supposing that, when Congress adopted the Equal Pay Act, it intended to restrict the scope of the preexisting federal classification and pay system or to impose upon the federal government for Equal Pay Act purposes a different, far narrower scheme.[24] Certainly, no such intention can be imputed to the Congress merely because of its use of the

ly extended to field offices. See Act of December 6, 1924, ch. 5, 43 Stat. 704; Act of March 5, 1928, ch. 126, § 2, 45 Stat. 162, 163.

17. Classification Act of 1949, ch. 782, § 101(1), 63 Stat. 954; see also, P.L. No. 89–554, 80 Stat. 378, codified at 5 U.S.C. §§ 5101–5115 (1976), amended in 1978 P.L. No. 95–454, 92 Stat. 1111, codified at 5 U.S.C. §§ 5102–5115.

18. The application of the standards to the classification of individual positions in accordance with these principles is the responsibility of the head of each executive agency. 5 U.S.C. §§ 5102, 5107.

19. The national scope of the equal pay principle with respect to the Civil Service is underlined by the fact that, when Congress wished to depart from that principle, it explicitly said so. Thus, 5 U.S.C. §§ 5341 *et seq.* recognizes that, with respect to certain classes of blue collar workers, the wage rates may differ depending upon the locality. As regards the Foreign Service, which also has a pay scheme unlike the regular Civil Service, see *Ososky v. Wick*, 704 F.2d 1264 (D.C. Cir.1983).

20. Formerly the Civil Service Commission.

21. 5 C.F.R. §§ 511.601–511.615.

22. 5 U.S.C. § 5110(a).

23. 5 U.S.C. §§ 5111, 5112.

24. Even if Congress might have expected the term "establishment" to be narrowly construed when the Equal Pay Act was initially applied to private employers, that understanding does not carry over to the proper construction of that term in the subsequently-included sphere of federal employment, for two reasons. First, as indicated above, the maximum wage, minimum hour provisions of the Fair Labor Standards Act have no relevance to governmental employment. Second, it would make no sense to assume that Congress meant the principle of equal pay for equal work to apply to issues arising under the Classification Act and under Title VII of the Civil Rights Act, but to have a wholly different, narrower rule govern when sex discrimination issues arose under the Equal Pay Act. In the absence of indicia of congressional intent regarding this problem when federal government employees were first covered under the Fair Labor Standards Act in 1974, it must be assumed that the Congress intended and expected consistency among the several statutory schemes. Expressions of congressional expectation of the relationship between the treatment of federal employees and the interpretations applicable "other sections of the economy," were confined to the issue of a possible conflict between the overtime provisions of the Fair Labor Standards Act and the earlier premium pay provisions applicable to federal employees. H.R. Rep. No. 93–913, 93rd Cong., 2d Sess. 28 (1974), U.S.Code Cong. & Admin.News 1974, p. 2811.

term "establishment" which, as we have seen, should not, under the case law, be given a purely geographic meaning when applied to other governmental employment schemes which are centrally administered.

■ The Equal Pay Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–16, and the Classification Act are *in pari materia*. These statutes are most appropriately construed together, and the Equal Pay Act should not be construed so as to undermine or contradict the related statutory schemes.[25] In short, it would be entirely unreasonable to superimpose only upon the Equal Pay Act a geographic fragmentation principle.

■ These conclusions are buttressed by general canons of statutory construction. As a remedial statute, the Equal Pay Act must, of course, be liberally construed.[26] The Supreme Court's admonition in *Phillips Co. v. Walling*, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945) is apt:

> The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Con-

gress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.[27]

It should be noted in this connection that many professional and managerial employees—like this plaintiff—have no counterparts in the particular office or plant where they may be located. To hold, therefore, that the term "establishment" has a narrow geographic meaning would leave such female employees wholly unprotected by the Equal Pay Act from unwarranted pay discrimination since the government's managers could always assert—with justification, if a geographic test applied—that there is no one to whom the female employee may be compared. See note 8 *supra*. The Court would not be justified in adopting a construction which effectively vitiated the Act for an entire class of employees.

■ For these reasons, the Court rejects the government's argument based on geographic location, and it holds that, at least for Pay Act purposes,[28] the "establishment" under that Act is the Civil Service in its entirety. It follows that, when a comparison is made between the pay of male employees and that of female employees, it must be made on the basis of the Civil Service as a whole, and a woman may not

---

25. See *e.g., Shultz v. Wheaton Glass Co., supra; Ososky v. Wick, supra.*

The government asserts that the plaintiff's claims are encompassed under the Classification Act, and the action therefore could only have been brought under that Act. But a violation of that statute does not negate an Equal Pay Act claim, especially where, as in this instance, and as in Title VII of the Civil Rights Act of 1964, the two laws cover similar subject matter. See *Shultz v. Wheaton Glass Company, supra.* The government's reliance to the contrary on *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), is misplaced, for the Supreme Court there dealt only with the jurisdiction of the Court of Claims and the reach of the Classification Act and the Back Pay Act.

There is no more reason to deny plaintiff her Equal Pay Act claim on the basis that her classification may also violate the Classification Act

than it would be to regard improper classification as a jurisdictional defense to a Title VII suit. Yet, in literally hundreds of cases brought in this Court every year violations of Title VII are alleged to have occurred and are in many instances redressed on account of improper classifications.

26. *Peyton v. Rowe*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968).

27. 324 U.S. at 493, 65 S.Ct. at 808. While the *Walling* decision directly concerned the wage and hour provisions of the Fair Labor Standards Act, the court in *Goose Creek, supra*, regarded the quoted language as directly relevant to the sex discrimination provisions of the Act.

28. Different considerations may conceivably be pertinent with respect to other laws.

be paid less than a man merely because she works in a different location.

■ This does not mean, of course, that the government may not distinguish between and among its employees on the basis of the duties and responsibilities vested in them. Nor does the Court hold that such distinctions are impermissible if geography is a factor.[29] However, if the duties and responsibilities of the position are substantially equal,[30] the burden is appropriately placed on the government, in view of the existence of a single nation-wide Civil Service system, to explain why it should be permitted to pay a lower wage or salary to a female employee notwithstanding the Equal Pay Act, merely because she is employed at a different location.[31] What the government may not do—as it argues it has the authority to do—is to refuse to take even the first step under the Equal Pay Act, that is, to refuse to compare the duties and responsibilities of employees of different genders to determine whether they warrant equal pay merely because the employees happen to be assigned to different locations.

### III

■ In order to determine what comparisons between and among employees should be made for Equal Pay Act purposes, using the standard of function rather than that of mere geography, the Court

now turns to the specific facts of this case. With regard to function, it is appropriate to inquire into three principal factors: the decree of centralized control in the Office of General Counsel of the Customs Service, the work performed in the Regional Offices, and the position description under which the plaintiff operated.

First. The various Regional Offices were subject to regulation and control from the Chief Counsel who treated them in every respect as being entirely under his jurisdiction. Thus, the Regional Counsel Offices are described in official documents as being "a part of the Office of the Chief Counsel" and every Regional Counsel is placed "under the general administrative direction of the Chief Counsel" [32] (presumably as distinguished from that of the particular Regional Commissioner of the Customs Service). The Regional Offices do not automatically handle all cases that come in to them; assignments may be, and occasionally are, made by the Chief Counsel's Office in Washington. That Office also controls the settlement of cases.

The Chief Counsel likewise controls the pay and budget process for all the regions, and he monitors the activities of the Regional Counsel Offices through various means, including regular monthly reports. In fact, the Chief Counsel recently reorganized his Office, and that reorganization eliminated the Regional Office in which plaintiff was employed.[33]

---

**29.** For example, the manager of a particular office of a government department or agency in New York City or Los Angeles who supervises hundreds of employees may be classified differently and may accordingly be paid more than a manager of a branch in a much smaller city with far fewer individuals under his supervision.

**30.** The Court of Appeals for the Third Circuit said in *Shultz v. Wheaton Glass Company, supra,* 421 F.2d at 265, that "Congress, in prescribing 'equal' work did not require that the jobs be identical, but only that they must be substantially equal."

**31.** See *Corning Glass v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

**32.** Position description for General Attorney (Customs) GS–15.

**33.** To be sure, some functions are performed by a Regional Counsel independently of the Chief Counsel's Office. It may also be true that, as the government claims, although the Chief Counsel sees many of the documents prepared in the offices of the Regional Counsel, "rarely does he review any of those documents before their issuance or submission to court," and he exercises his supervisory role "chiefly" through review of monthly statistical reports, quarterly reports of significant activities and an annual survey visit to each Regional Counsel office. It is also true that some Regional Offices handle more tort claims while the workload of others is characterized by litigation and administrative hearings, and that the staff varies from three attorneys and two support persons in one office to eight attorneys and four support persons in another. Defendants' Memorandum in Support of Motion for Summary Judgment at 4. But

Second. All the Regional Offices of the Customs Service legal department perform the same basic functions regardless of their size or location. Not only did the Treasury not reduce the duties and responsibilities of the Baltimore Office or those of the individual occupying it,[34] but during plaintiff's incumbency that Office handled more cases than at least on other Regional Office (occupied by a male GS–15). Furthermore, while plaintiff was Regional Counsel in Baltimore, the caseload doubled compared to what it was when her male GS–15 predecessor was in charge.[35]

Third. Plaintiff was operating under a standard position description which is the same that was used for all other Regional Counsel positions.[36] That document classified the position held by plaintiff as a GS–15.[37] The classification was not changed after plaintiff's predecessor left office,[38] nor was it changed at any time during plaintiff's tenure.

In response to these facts regarding the position description, the government's papers [39] suggest only two relatively minor problems. The government argues, first,

that the vacancy announcement described the position merely as a GS–14/15 (rather than as the GS–15 as the position description required). But that vacancy announcement did not and it obviously could not vary the basic description of the job which, as indicated, called for a grade GS–15. Beyond that, the government seems to assert that the continued viability of the GS–15 position description in the context of plaintiff's application was the result of "inadvertence." That bare suggestion, unsupported by any evidence, is plainly insufficient to create a genuine issue of material fact.[40] Moreover, there would have been no basis whatever for the sudden establishment of a new position description. The position was what it had always been: the highest legal position in one of the nine regions in the Customs Service with duties and responsibilities equal to those of the other eight regions.

The government's motion for summary judgment, which is predicated on the theory that the Baltimore Regional Office of the Customs Service is a separate "establishment" within the meaning of the Equal Pay Act, will therefore be denied.

none of this establishes a Regional Office as an independent entity for Equal Pay Act or any other purposes. It merely demonstrates that employees at the GS–15 level have some decision-making latitude in the Customs Service just as they do in any agency of the federal government and that other, normal variations exist with respect to such matters as the precise distribution of the workload. See note 30 *supra*.

**34.** In fact, the Chief Counsel of the Customs Service advised all Regional Counsels, including this plaintiff, on August 28, 1980, that
 I strongly believe that all Regional Counsels ... should be judged on the same basis with respect to their performance.
Exhibit 2 attached to Grumbine affidavit of April 15, 1983.

**35.** The quality of plaintiff's work was likewise beyond reproach. A memorandum from the Chief Counsel dated October 9, 1981 states that when plaintiff
 ... assumed direction of the Baltimore office, its workload and productivity were extremely low; its reputation for availability, initiative and responsiveness was poor .... I am pleased to report that major strides have been made in improving the quality of legal services to the region....

**36.** That position description was used, *inter alia*, in classifying the position of plaintiff's GS–15 male predecessor, as well as that of Paul Wilson who was classified as a GS–15 without the one year in grade which is claimed by government to disqualify plaintiff from a GS–15. See Part IV *infra*.

**37.** In the Civil Service, salary is determined by the classification. *Ososky v. Wick, supra.*

**38.** With respect to the replacement of a male employee in the same job with a lower-paid female, see *Thompson v. Sawyer,* 678 F.2d 257, 277 (D.C.Cir.1982).

**39.** Voluminous briefs and other papers were filed by both sides.

**40.** The applicable regulations require agency management to maintain "current and accurate" descriptions of the position, and they further provide that the appointing official must assure himself, prior to appointment, that the position is properly classified. Federal Personnel Manual, ch. 511, subch. 4–4; ch. 312, subch. 4–5.a.

## IV

■ Both plaintiff and the government have moved for summary judgment or partial summary judgment on alternative grounds.[41] These motions revolve primarily around regulations modelled on the so-called Whitten Amendment[42] which generally requires a federal employee to serve at least one year in a particular grade before being eligible for promotion to the next higher grade. A regulation promulgated by OPM provides that

[a]n agency head may advance an employee to a position at GS–12 or above only after he has served one year at the next lower grade.[43]

The government claims that the OPM regulation constitutes a bona fide seniority system within the meaning of the Equal Pay Act[44] and that, irrespective of any other considerations, plaintiff cannot complain of a violation of that statute. That is so, the government reasons, because when Ms. Grumbine was appointed a Regional Counsel, she was only a GS–13 and she therefore could not have been given a GS–15 rating without running afoul of the OPM regulation. While also making several other claims,[45] plaintiff responds primarily by pointing to the experience of one Paul Wilson who was appointed Regional Counsel at the same time as plaintiff at the GS–15 grade even though he, too, lacked the requisite one year in grade GS–14.[46]

It is obvious that, inasmuch as the one-year-in-grade requirement was waived[47] for Wilson, the OPM regulation is not iron-clad as the government would make it appear. Certainly, if that regulation was enforced selectively or discriminatorily, the government could not rely on it or the existence of a bona fide seniority system in defense of its actions, and the exception to the Equal Pay Act would not apply. And of course in this context as in others—such as under Title VII of the Civil Rights Act—the question of discriminatory treatment is primarily one of fact. There are here sharply differing views on the operative factors.

Thus, the government contends that, for various reasons, plaintiff was not situated as was Wilson. The latter, according to the government, had more experience; his assignment to a Regional Counsel position entailed significant personal hardship; and, unlike plaintiff, he specifically requested waiver of the regulation on hardship grounds.[48] Plaintiff, on the other hand,

41. The Court will allow plaintiff to file her amended complaint to accommodate her alternative summary judgment motion.

42. The Whitten Amendment is a congressionally-mandated rule of long standing.

43. 5 C.F.R. § 300.602 (1982). A directive of the Treasury Department's General Counsel is to the same effect. General Counsel Directive No. 2 (Revised) ¶ 5.3.1., p. 4.

44. The Equal Pay Act mandates an exception to its requirements in a case where payment of differential wages is made "pursuant to ... a seniority system ...." 29 U.S.C. § 206(d)(1).

45. Plaintiff also argues that the vacancy announcement itself did not require service for one year at the GS–14 level, and that the OPM regulation may not have applied at all because of the existence at the Treasury of two tracks, one for promotions and the other for appointments, with the regulation applying only to the former. See *Dowd v. United States*, 713 F.2d 720 (Fed.Cir.1983).

46. Wilson, plaintiff, and the Regional Counsel for New Orleans were part of the same selection process: the positions were advertised simultaneously, the applicants were interviewed together, and the appointments were made at the same time. Only Margaret Mary Grumbine, the one female appointee, was classified and paid at a GS–14.

47. There is provision in the regulations for such a waiver. See 5 C.F.R. Part 300, subpart F.

48. The government's argument that the treatment of Paul Wilson was "the proverbial exception that proves the rule" (Memorandum of March 7, 1983 at 8) is far from a satisfactory defense, however, particularly in a job classification with only seven members. Similarly unsatisfactory is the government's assertion that the waiver for Paul Wilson is a "red herring [which] merely serves to distract this Court from the consistently applied eligibility requirement." Response filed November 7, 1983. While it may ultimately turn out that the Wilson departure from the rules was justified and does not affect plaintiff's claim, facts concerning his

maintains that her prior experience was equivalent to Wilson's,[49] and that, unlike Wilson, she was never given an opportunity to apply for a hardship waiver.[50]

It is apparent from a mere recitation of these contentions that genuine issues of material fact exist with respect to the alternative summary judgment motions which cannot be resolved without a trial.[51] Accordingly, both of these motions will be denied.

treatment are far from a "red herring"; they directly cast doubt on the government's contention that the eligibility requirements were, in fact, consistently applied.

49. See *Shaw v. Boorstin,* 517 F.Supp. 336 (D.D. C.1981).

50. Plaintiff also argues that the one-year time-in-grade requirement was established in this case only by an inadmissible affidavit. There is no merit to that contention. Irrespective of the technical admissibility or inadmissibility of the affidavit in question (or parts thereof), that document does no more than to serve as a conduit for documents (such as official directives and the like) which the Court may consider in any event under any reading of the Rules; *e.g.,* Rule 803(8) of the Federal Rules of Evidence.

51. To permit a resolution of the disputed facts, the Court will lift the previously-imposed stay on discovery.